509 P.2d 619

The STATE of Arizona, Appellee,

v.

Charles SCHMID, Appellant.

No. 1720.

Supreme Court of Arizona,
In Banc.

April 25, 1973.

Rehearing Denied July 3, 1973.

**350**

Gary K. Nelson, Atty. Gen. by William J. Schafer, III, Asst. Atty. Gen., Phoenix, for appellee.

Norval W. Jasper, Tucson, for appellant.

PHILIP W. MARQUARDT, Superior Court Judge.

On December 21, 1965, the Appellant was charged with the murders of Gretchen and Wendy Fritz; however, the facts of this appeal begin with a murder in another case State v. Schmid, 107 Ariz. 191, 484 P.2d 187 (1971).

During May, 1964, the Appellant Schmid and Mary French, a 17 year old girl, were dating. During that time the Appellant suggested to her that she lure Aileen Rowe from her home during the night. The Appellant stated that he wanted "to kill someone" and that he wanted to do it that night. At first Miss French refused. Appellant contacted Miss French four or five times about calling Miss Rowe to get her out of her home. Eventually, Mary French agreed to call. Miss French called two or three times and each time, except the last, Aileen Rowe refused. Finally, it was arranged that there would be a double date; Aileen would go with John Saunders and Mary French would go with the Appellant. The trial testimony showed that later, but before the date, the Appel-

lant told French and Saunders, that he planned to hit Aileen with a rock and bury her in the desert.

All three went to Saunders house, where Appellant got a shovel and put it in the trunk of his car. Then they drove around for awhile and after Aileen's mother had left for work pulled into the alley to the Rowe home and got Aileen out of bed. She was wearing a bathing suit and her hair was in curlers. From there they drove to the desert and walked down to a wash. After they sat down and started talking, Appellant asked Mary French if she would go back to the car and get the radio. He started to go with her, but when they heard Aileen scream he told Mary to go back to the car and stay there and he would go back to the wash below.

Mary had been sitting in the car for thirty to forty-five minutes, when she heard a noise and saw John Saunders. He told her the Appellant wanted her to come back down to the wash, but she refused and remained in the car. Shortly after that the Appellant appeared and got into the car. "We killed her," he said. He kissed Mary, told her he loved her very much, and then got the shovel out of the trunk. Mary went with the two men. When they went down to the wash, Mary saw Aileen sprawled in the sand with blood on her face. All three dug a hole and buried Aileen, her clothes and curlers. A short time later Appellant boasted to one of his close friends, Paul Ginn, that he and his friends had killed Aileen Rowe.

The same summer, 1964, Appellant began to date Gretchen Fritz. She was 16 at the time and had a 12 year old sister, Wendy. The relationship between Appellant and Gretchen became a very close relationship, but as the summer of the next year approached the relationship began to cool. Gretchen pestered Appellant with "incessant" phone calls. The Appellant spoke harshly of her and attempted various schemes to force a split between them. On one occasion he paid a friend to meet Gretchen and then allow the Appellant and other friends to jump from behind bushes and pretend they believed Gretchen was meeting this boy as a lover. On another occasion Appellant had a different friend borrow a gun and scare Gretchen with it. Later he asked the same boy to throw acid in Gretchen's face.

As Gretchen's demands became more insistent, Appellant told a few of his friends that he couldn't stop her because she knew that he had killed Aileen Rowe and he was afraid that she would turn him into the police. To other friends he said he was powerless against Gretchen, because she had stolen a diary of his that contained information, which, if known to the police, could send him to the electric chair. The diary contained, he said, an account of how he killed a young boy, cut off his hands, and then buried him.

In the summer of 1965, Appellant expressed an intense hostility to Gretchen Fritz and the hold she had on him. On a number of occasions he told his friends that he would like to kill her, and "twist her pretty little neck." As the summer passed, the Appellant sought with increasing effort to get his diary back. The two of them argued almost daily about the diary.

Shortly before the girls disappeared in August of 1965, the Appellant said that in a little while, Gretchen was going away with an Aunt in the east, permanently. Then one night he announced to a friend that Gretchen was going to take him to a bank, where she was going to give him the diary. He never got the diary, but that night Gretchen left him ten miles out in the desert and made him walk back to his house. Once again Appellant expressed a desire to do away with Miss Fritz. In the early part of August, 1965, a boarder who lived with Appellant heard him running through the house. He was pulling blinds and curtains and shutting doors. He was very nervous and he said that they were coming to get him. When asked, "Who", he responded, "The cops, Gretchen turned me in. She has taken the diary and turned

me in." Shortly after this the Appellant said that he and Paul Ginn were going to get the diary back.

A few days before the girls' disappearance, the Appellant, in answer to one of Gretchen's telephone calls, appeared at her house. He went into her room where they argued; then he slapped her and left with the statement, "That's it."

The night that the girls disappeared there was a party at Appellant's house during which he received a telephone call. Paul Ginn answered it. Paul told him that it was Gretchen, and that if he didn't come she was going to tell her father. The Appellant got mad and said he was going to get that "bitch" if it was the last thing he did. He called Paul into a back room. When they emerged Appellant was carrying an old scuffed briefcase, and they left. Approximately one o'clock the next morning all the guests but one had left. As they approached the house, Appellant told Paul to keep it down, that the people inside might hear them. Paul said he wanted no part of it, that he was not involved. When they entered, the one remaining guest noticed that the Appellant was sweaty and covered with dust and appeared scared, "like something was wrong with him." Appellant told her that they had been in a fight at the Flamingo Hotel. That night the girls did not return home from a trip to a drive-in movie.

The next morning, Appellant told a friend that Gretchen and Wendy had run away and left in a car, a Pontiac LeMans; that he had had a fight with Gretchen that night and that now he could go out with anybody he wanted to.

A week later Appellant told Richard Bruns that he had killed the girls and dumped them in the desert, leaving Gretchen's car at the Flamingo Hotel. It was finally over, he said, he didn't have to worry anymore.

A week later, Appellant took Bruns to a desolate area off Pontatoc Road and showed him the bodies of Gretchen and Wendy. Gretchen's body was lying at the bottom of a slope, in a wash, and Wendy's body was lying in a shallow hole partially covered with dirt. An electric cord was straightened out under the jawbone, but curled at both ends. This cord was identified, because of its peculiar markings, as looking like the same one that had once been attached to the Appellant's guitar. The Pontiac LeMans was recovered in the parking lot of the Flamingo Hotel, dirty and splattered with mud in the interior.

In November, with the aid of Richard Bruns, the police recovered the bodies at the Pontatoc Road area in Tucson. Their dentists identified them as Gretchen and Wendy Fritz.

Two informations were filed against the Appellant for three murders. The first trial was held for the murder of the Fritz girls. That trial took place between February 15 and March 1, 1965, and is the subject of this appeal. A year later, in March of 1966, the Appellant went to trial for the murder of Aileen Rowe and after five days of trial, pleaded guilty. The Rowe plea and conviction thereon was affirmed by this court on April 28, 1971, and the Fritz appeal is now before this court.

## I.

Appellant contends that he was deprived of a fair trial because of prejudicial publicity.

Extensive *voir dire* of the panel assured the defendant of a fair and impartial jury. Seven jurors who had formed opinions at the time of questioning were dismissed. The remaining jurors, who held no opinions about the guilt of the Appellant, had been aware of news media coverage, but potential jurors need not be totally ignorant of the facts of a case. "It is not required however that the jurors be totally ignorant of the facts and issues involved." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 756 (1961). "The fact that several jurors, or all the members of a panel, have read newspaper articles relating to a case does not disqualify them as jurors. This is true even though a ju-

ror may have had a preconceived notion as to guilt or innocence of an accused." Evans v. Arizona, 410 F.2d 1122, 1124 (9th Cir. 1969).

"The failure of the trial judge to exclude for cause each prospective juror who admitted possessing some degree of knowledge of this case was not error: Rule 220, Rules of Criminal Procedure, 17 A.R.S., expressly provides that the fact that a person, called as a juror, has formed an opinion or impression based upon rumor, or upon news reports, about the truth of which he has expressed no opinion should not disqualify him to serve as a juror in such action, if he upon oath states that he believes he can fairly and impartially render a verdict in accordance with the law and the evidence, and the court is satisfied with the truth of such statement." State v. Schmid, 107 Ariz. 191, 484 P.2d 187 (1971).

And:

"It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

■ In this case, the *voir dire* discloses only that the jurors knew of the case. Appellant did not challenge a single juror for cause. On the basis of this record, Appellant has failed to show that at the time of their empaneling, the jurors were prejudicially biased against him.

The jury was sequestered early in the trial. Appellant has also failed to show that prejudice seeped into the minds of the jurors during the trial.

The traditional rule (Irvin v. Dowd, *supra*) in such cases has been that there must exist a nexus between the community prejudice and jury prejudice. Hale v. United States, 435 F.2d 737 (5th Cir. 1970), cert. den. 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed. 2d 142 (1970). However, the recent Supreme Court decisions in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16

L.Ed.2d 600 (1966) and Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), reh. den. 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965), have fashioned the principle that in certain extreme circumstances the actual existence of prejudice in the jury box need not be shown.

■ We hold that without a showing of such outrageous circumstances as *Sheppard* or *Estes*, where an accused is subjected to widespread publicity prior to and during the trial, it is not enough to allege that there was extensive press coverage of the trial or the events preceding it, unless jury prejudice can be proved.

As we now view the situation under the circumstances here, the question for our consideration is not whether all publicity concerning the trial is *per se* prejudicial, but rather *what* publicity before and during a criminal trial is permissible without infringing upon the rights of the accused. Because of the unusual situation before us, we feel that it deserves special consideration.

Direct restraints upon the press, in the exercise of the contempt power, are inimical to the American tradition of a free press. The law can, however, alleviate the problem of "trial by newspaper." Rather than ask that government restrict the press, we prefer to ask the press itself to provide balanced and responsible coverage of criminal cases. This can best be achieved if attorneys for both the defense and the prosecution observe The American Bar Association Code of Professional Responsibility. [*See* Ariz.Rev.Stat. § 32–267, subsec. 8.]

■ To preserve the rights of the accused and prevent the reversal of a conviction, it is suggested that the news media restrict its coverage. Publicity of the following may result in reversal:

(1) the character, reputation, or prior criminal record (including arrests, indictment, or other criminal charges) of the accused;

(2) the possibility of a plea of guilty to the offense charged or to a lessor offense;

(3) the existence or contents of any confession, admission, or statement given by the accused, or his refusal or failure to make a statement;

(4) the performance or results of any examinations or tests, or the refusal or failure of the accused to submit to examinations or tests;

(5) the identity, testimony or credibility of prospective witnesses;

(6) any opinion as to the guilt or innocence of the accused, the evidence or the merits of the case.

In view of the nature of the issue posed, the foregoing should not be taken as a hard and fast definition, nor as an exhaustive listing of the considerations involved in making a determination in this area. No doubt other factors worthy of consideration will appear in the course of litigation.

█ While we are somewhat alarmed by the fact that a photograph was taken with a flashbulb during the final court session at which the verdict was read, the vital question remains whether or not this constitutes reversible error. We hold that the defendant was not denied his right to a fair trial by this act.

█ Due to the possibility of similar activities occurring in the future, it is in no way objectionable for the trial court, in unusual cases, to issue an order governing matters such as extrajudicial statements by parties or witnesses which seem likely to interfere with the rights of the accused to a fair trial by an impartial jury; the seating and conduct of spectators and news media representatives; the management and sequestering of jurors and witnesses; or any other matters which the court may find appropriate for inclusion in such an order. McLucas v. Palmer, 427 F.2d 239 (2nd Cir. 1970), cert. den. 399 U.S. 937, 90 S.Ct. 2271, 26 L.Ed.2d 808 (1970); United States v. Vealey, 308 F.Supp. 653 (N.D. Ohio 1970).

█ We feel that not only is the accused entitled to a fair trial, free from prejudicial publicity, but that the public has a right to be informed as to what is occurring within its courts. Therefore, we find the Appellant's appeal on the grounds of prejudicial publicity without merit.

## II.

█ We hold that Appellant's contention concerning the exclusion of jurors who voiced only general objections, or conscientious, or religious scruples against the death penalty is moot, in view of the United States Supreme Court's decision abolishing the death penalty in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346 (1972); Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed. 2d 744 (1972); State v. Chatman, 109 Ariz. 275, 508 P.2d 739 (1973); State v. Taylor, 109 Ariz. 267, 508 P.2d 731 (1973).

## III.

The trial court admitted, over objection, evidence that the Appellant killed Aileen Rowe and a boy whose hands he cut off. Appellant claims the admission of this evidence was error by the court.

█ Generally, evidence of other crimes is not admissible in a trial. This rule is subject to certain exceptions, one of which is where the evidence of the other offense tends to prove a motive for the present offense. State v. Schmid, *supra*; Douglass v. State, 44 Ariz. 84, 33 P.2d 985 (1934); Comancho v. State, 39 Ariz. 556, 8 P.2d 772 (1932); Lawrence v. State, 29 Ariz. 247, 240 P. 863, cert. den. 269 U.S. 585, 46 S.Ct. 201, 70 L.Ed. 425 (1925); C. McCormick, Law of Evidence, § 157 at 330 (1st Ed. 1954); II Wigmore, Evidence, § 390 at 331 (3rd Ed. 1940); M. Udall, Arizona Law of Evidence, § 115 at 227 (1960).

█ The Appellant cites *Comancho* as authority that this court has previously rejected evidence of another crime. This court, however, rejected the proof offered in *Comancho* because there was "not a scintilla of evidence" that the victim (the alleged witness to the prior killing) threat-

ened the defendant with the discovery of a prior crime, or even that the victim knew more about that prior killing than any other member of the public. The case before us is far different. Gretchen Fritz did know the details of two prior killings, and had on a number of occasions used that knowledge in a threatening manner. Either killing admitted by the Appellant was sufficient to show a motive for the murder of the Fritz sisters. Also, the fact that the evidence of the prior killings came by admissions from the Appellant's own lips makes no difference. In the case of Lawrence v. State, *supra*, before a policeman died he told witnesses that he was about to arrest the defendant for a minor offense of stealing gasoline when, for no apparent reason, the deceased shot him. To prove why, the State offered evidence that the defendant was, at the time of the killing, under indictment for murder in Texas.

" * * * if defendant were under indictment in some other jurisdiction for a crime carrying with it the death penalty, the jury might well assume that he would deliberately and wilfully kill the officer rather than be taken to a place where his identity might be determined and the consequences of his previous crime visited upon him." Lawrence v. State, *supra*, 29 Ariz. 247 at 260, 240 P. 863 at 868.

█ There is no requirement that before the State introduces evidence of motive (which may show another offense) that the charge be "substantially proven" or "admitted by the defendant" or that evidence of motive be limited to rebut some defensive matter, as has been stated by the Appellant. Motive is almost invariably relevant. Comancho v. State, *supra*.

In State v. Schmid, *supra*, this court upheld the conviction of the Appellant upon his plea of guilty to murdering Aileen Rowe. In that trial the State proved that the Appellant killed the Fritz girls to cover up the prior Rowe killing. We held that there is a definite connection between the two crimes; citing State v. Villavicencio,

95 Ariz. 199, 388 P.2d 245 (1964), that evidence of the other crime was admissible. The same is true here.

### IV.

█ Appellant objects to the trial court admitting testimony of Edna Holder to the effect that she heard Paul Ginn tell the defendant of a telephone conversation that Ginn had with Gretchen Fritz on the night of the girl's disappearance.

Miss Holder testified that on the night the Fritz girls disappeared she was at a party at the Appellant's house. When the telephone rang, Appellant told Paul Ginn to answer it. After he hung up Paul told the Appellant that it was Gretchen (Fritz) and "That she wanted to meet him and if he didn't come she would tell her father." Both Appellant and Ginn then went into a back room. After a few minutes they left carrying a "scuffed up" briefcase. Miss Holder stated that immediately after the phone call that night, Appellant said "he was going to get that bitch if it was the last thing he would do, or something like that."

The purpose of Miss Holder's testimony was to show the effect of Ginn's statement upon the Appellant. This is an example of the exception to the hearsay rule, which permits the introduction of out of court statements to show their effect on the hearer. VI Wigmore, Evidence, § 1789 at 235 (3rd Ed. 1940); C. McCormick, Law of Evidence, § 228 at 463 (1st Ed. 1954); 29 Am.Jur.2d Evidence, § 497; M.Udall, Arizona Law of Evidence, § 173 at 345 (1960).

We find that we are in accord with the above authorities. The statements offered by the State were to prove the state of the defendant's mind and not to prove the truth of the words offered, and, therefore, were admissible.

### V.

Appellant objects to the trial court's rejection of evidence offered by Appellant that Bruns committed the murders.

The court did not allow an answer to a question inquiring whether Bruns had threatened his girl friend (who had nothing to do with the victims here). There is no evidence that Bruns killed the Fritz girls, even upon a showing of new evidence by the Appellant.

■ It is tenuous to assume that because Bruns made threats in another wholly unrelated matter that this would tend to prove he murdered Gretchen Fritz. The rule is that threats by a third person against a victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime. Marrone v. State, (Alaska) 359 P.2d 969 (1961); see also Gatewood v. State, 80 Okl.Cr. 135, 157 P.2d 473 (1945); McElroy v. State, 100 Ark. 301, 140 S.W. 8 (1911). We find that there was no such evidence that the unconnected threats were probative of any issue and that the court properly rejected same.

## VI.

■ The Appellant complains that it was error for the court to instruct only on First Degree Murder, when there was no evidence of any other degree of the same crime. There was no evidence before the court that the killings were other than premeditated; therefore, there is no error in not instructing on murder in the second degree. State v. Malumphy, 105 Ariz. 200, 461 P.2d 677 (1969); State v. Foggy, 101 Ariz. 459, 420 P.2d 934, cert. den. 386 U.S. 1025, 87 S.Ct. 1386, 18 L.Ed.2d 468 (1969); State v. Kruchten, 101 Ariz. 186, 417 P.2d 510 (1966), cert. den. 385 U.S. 1043, 87 S. Ct. 784, 17 L.Ed.2d 687 (1967); State v. Schroeder, 95 Ariz. 255, 389 P.2d 255, cert. den. 379 U.S. 939, 85 S.Ct. 347, 13 L.Ed.2d 350 (1964); State v. Folk, 78 Ariz. 205, 277 P.2d 1016 (1954); Miranda v. State, 42 Ariz. 358, 26 P.2d 241 (1933).

We believe, under the totality of the circumstances in this case, that the Appellant had a fair and impartial trial and that the evidence supports the verdict. We have searched the record for fundamental error and have found none. § 13–1715 A.R.S., State v. Burrell, 96 Ariz. 233, 393 P.2d 921 (1964).

The Supreme Court of the United States vacated the judgments of several Arizona cases in memorandum opinions wherein the imposition of the death penalty remained undisturbed on the grounds it was proscribed as cruel and unusual punishment by the Eighth and Fourteenth Amendments, citing Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972).

■ In view of the foregoing, we hold that the death penalty provisions of § 13–453, subsec. A A.R.S. are unconstitutional. Although the conviction stands affirmed, pursuant to § 13–1717, subsec. B (1956), the sentence is hereby reduced to life imprisonment.

CAMERON, V. C. J., STRUCKMEYER and LOCKWOOD, JJ., and UDALL, Retired Justice, concur.

HAYS, C. J., did not participate in the determination of this matter. Judge PHILIP W. MARQUARDT of Maricopa County Superior Court was called to sit in his stead.