626 P.2d 118

STATE of Arizona, Appellee,

v.

Randy GREENAWALT, Raymond Curtis
Tison and Ricky Wayne Tison,
Appellants.

No. 4611.

Supreme Court of Arizona,
In Banc.

Feb. 24, 1981.

Rehearing Denied March 31, 1981.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III and Bruce M. Ferg, Asst. Attys. Gen., Phoenix, for appellee.

Robert C. Brown, Casa Grande, for appellant Randy Greenawalt.

Platt, Jenson & Johnson by Boyd T. Johnson, Coolidge, for appellant Raymond Curtis Tison.

Echeverria, Glenn & Howard by Phillip W. Glenn and Dwight P. Callahan, Casa Grande, for appellant Ricky Wayne Tison.

STRUCKMEYER, Chief Justice.

This appeal arises from convictions for numerous offenses committed during an escape from the Arizona State Prison in Florence on July 30, 1978, and at a roadblock near Casa Grande on August 11, 1978. We have jurisdiction by A.R.S. § 13–4031. Affirmed.

On July 30, 1978, appellant Greenawalt and Gary Tison, the father of the two other appellants, were incarcerated at the state prison. Greenawalt and Gary Tison were cell mates, serving life sentences for murder. Early that morning, appellant Raymond Tison arrived at the north annex of the prison to visit his father. While these two visited, appellant Greenawalt was in the nearby control room, preparing some prisoners' work rosters. Shortly thereafter, appellant Ricky Tison and his brother, Donald Tison, entered the yard office of the annex, carrying an ice chest. Ricky removed a shotgun from the chest and pointed it at two guards. Donald Tison passed a handgun to Greenawalt, who ordered the two guards to lie on the floor. Greenawalt then passed the gun to Gary Tison and obtained another shotgun. Gary Tison rounded up other guards in the area, escorted them into the yard office and then ordered all of them into a small storage closet. Civilians, who were at the annex to visit other prisoners, were first ordered to stand against a wall. Later they were also taken to the storage closet and locked in with the guards. Greenawalt and the Tisons then fled from the prison.

The five men eluded capture for eleven days, during which time a family of four was murdered near Yuma, Arizona. The convictions and death sentences of appellant Greenawalt for these killings were affirmed in *State v. Greenawalt,* 128 Ariz. 150, 624 P.2d 828 (1981).

In the early morning hours of August 11, 1978, Pinal County sheriffs set up two roadblocks near Casa Grande, Arizona, believing the five men would be traveling through the area. Just before 3:00 a. m., a van

approached one of the roadblocks, slowed almost to a stop, then accelerated past the roadblock. Two gunshots were first fired from the van. Later more shots were fired from the van as officers from the roadblock pursued in two police cars. Another roadblock was notified and as the van approached, the officers at the second roadblock heard shots and saw muzzle flashes coming from the van. Believing they were being fired upon, these officers shot at the van. After running the second roadblock, the van turned off into the desert and stopped. In the driver's seat of the van, the pursuing officers found Donald Tison, shot, unconscious and dying. Aided by a helicopter's searchlight, the officers discovered Greenawalt and the two Tison brothers, appellants herein, hiding in the desert close by. No trace was found of Gary Tison until several days later when his body was discovered in a nearby wash.

After a jury trial, appellants were each convicted of seventeen counts of assault with a deadly weapon (A.R.S. § 13–249(B))[1] and one count each of possession of a stolen motor vehicle (A.R.S. § 13–672.01) and unlawful flight from a pursuing law enforcement vehicle (A.R.S. § 28–622.01). Appellant Greenawalt was further convicted of escape (A.R.S. § 13–392) and possession of a deadly weapon by a prisoner (A.R.S. § 31–232); while both Tisons were found guilty of aiding and assisting an escape (A.R.S. § 13–391), with Ricky Tison alone being convicted of taking prohibited articles into prison (A.R.S. § 31–230).

The Tisons received sentences of 30 years to life for the assaults, the sentences to be concurrent. For the rest of the offenses, they received sentences of four to five years, these sentences to be served concurrently, but consecutively to the assault sentences.

Greenawalt was sentenced to terms of thirty years to life for the thirteen assaults committed during the escape and for possession of a deadly weapon, along with a four to five-year term for escape, the sentences running concurrently. Greenawalt also received sentences of thirty years to life for the roadblock assaults and sentences of four to five years for possession of a stolen motor vehicle and unlawful flight. These latter sentences are to run concurrently to each other, but consecutively to the sentences for the crimes arising out of the prison escape. All the sentences imposed on Greenawalt in this action will run consecutively to the life term he was serving prior to the escape.

■ Appellants contend the trial judge erred in denying their motion to change venue or venire, grant a continuance or dismiss the indictment, resulting in a denial of their right to a fair trial. The determinations of motions for a change of venue, change of venire and a continuance rest within the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of that discretion resulting in prejudice to the defendant. *State v. Greenawalt, supra*; Rule 10.3(b), Rules of Criminal Procedure, 17 A.R.S.

Appellants argue the media coverage in this case was so outrageous that prejudice and unfairness must be presumed. We recognized this principle in *State v. Smith*, 123 Ariz. 231, 236, 599 P.2d 187 (1979), yet we found no such outrageous conduct there. Instead, it has only been found where the "proceedings * * * lacked the solemnity and sobriety appropriate to a judicial proceeding, and, instead * * * developed a carnival-like atmosphere." *State v. Greenawalt, supra,* at 842; see *Dobbert v. Florida*, 432 U.S. 304, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Appellants point to nothing as evidence that their trial was conducted in a less than solemn and sober manner. The record itself discloses no outrageous conduct by the parties or the press. Appellants must therefore show specific publicity which has reached prospective jurors and which is so prejudicial that the jurors cannot set it aside. *State v. Smith*, 116 Ariz. 387, 390, 569 P.2d 817 (1977).

1. All citations to Title 13, A.R.S. refer to the code as it existed prior to the 1978 revisions.

Every member of the jury panel knew of the appellants in some way. This is not surprising. The escape of two convicted murderers from the state prison is clearly newsworthy. And when the two and their accomplices are not immediately apprehended, but, rather, are implicated in new murders, extensive coverage of their capture and trial is to be expected. Moreover, the public had a right to a free and open discussion on the issues crystalized by the escape and subsequent incidents; issues which touched all phases of our criminal justice system, notably capital punishment and government officials who allegedly "coddle" criminals.

■ Publicity about appellants and other criminal defendants serves an important First Amendment interest. See *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 571–572, 100 S.Ct. 2814, 2824–25, 65 L.Ed.2d 973 (1980); *Nebraska Press Ass'n. v. Stuart,* 427 U.S. 539, 587, 96 S.Ct. 2791, 2816, 49 L.Ed.2d 683 (1976) (Brennan concurring). It is in consideration of this First Amendment interest that the law requires a defendant to show the prejudice of the publicity, not simply its extensiveness. Hence, the issue is whether the jurors can actually set aside their knowledge and opinions to render a verdict based solely on the evidence produced in court. See *State v. Greenawalt, supra.*

While every member of the jury panel had heard about the appellants, the amount of knowledge varied markedly from juror to juror. Some knew details of the crimes, while one juror recalled absolutely nothing about the crimes. The majority of potential jurors remembered the incidents in August, 1978 in only a general and vague way. More important, even though about one-half of the panel admitted to having preconceived opinions on appellants' guilt, half of those swore the opinions were so weak they could be set aside. Veniremen who could not so swear or swore they "would try" to set the opinion aside were excused.

■ Appellants correctly point out that *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), holds that jurors' assur-

ances of impartiality are not dispositive. Instead, the record of voir dire must be examined to determine if the total circumstances of the case and its publicity exhibit actual prejudice. The most important factors in this determination are the nature of the publicity and the difficulty in selecting a jury.

■ Appellants state they "were the subject of front page headlines, feature stories, photographs, and editorials on virtually a daily basis from July 30, 1978 through the date of trial" and that the publicity about them was "very intense and often emotion charged." The newspaper articles submitted by appellants do not support these assertions. Nearly all were dispassionate factual summaries of the alleged offenses and the progress of the manhunt. Appellants stopped being "the subject of front page headlines * * * on virtually a daily basis" near the end of August when Gary Tison's body was discovered. The newspapers published only one or two front-page stories each from that time until the December trial.

The only material that could be described as inflammatory appeared in the Yuma Daily Sun, a paper no member of the Pinal County jury panel read, and in editorials and letters to the editor in the Arizona Republic, a Phoenix newspaper. The letters to the editor, on the whole, do not show a specific prejudice against appellants. Rather, they illustrate a disdain for all criminals and for government officials who, in the eyes of the letter writers, do not deal harshly enough with criminals. The bulk of these letters were published in August. The editorials singled out appeared on August 9 and 16, 1978. The editorials detailed the histories and past criminal records of appellants, especially appellant Greenawalt. The August 16 editorial concluded by noting that only one Tison (Donald) was dead and remarking: "That might build a horrible final score: Killers 8, Society 1."

While clearly inflammatory, the material in the Republic was shown to have little effect on the jury panel. Of the twenty-

three asked, only three potential jurors knew Greenawalt was a convicted murderer. Of the two Republic readers questioned by appellants' counsel, one testified he did not remember any heated discussions about appellants or that people were "up in arms." The other reader recognized the name of the editorial's author, but the juror remarked, incorrectly, that he wrote nothing on appellants. The appellants failed to show, unlike *Irvin v. Dowd, supra*, that the community here was inflamed against appellants at the time of their trial.

This lack of prejudice is also illustrated by the ease of jury selection. Only forty-nine veniremen were needed to form the thirty-person panel on which the parties exercised their peremptory challenges. Of the nineteen excused for cause, only ten or eleven[2] were excused for fixed opinions on guilt. Appellants argue more jurors would have been excused for cause had the trial judge employed the proper standard for disqualification and had he not "intimidated" the potential jurors during voir dire.

It is contended the judge approved jurors who stated they would only "try" to set aside their opinions. As an illustration, appellants point to the following exchange between the judge and a juror:

> "THE COURT: But if you can lay aside those opinions or those prejudices or feelings you might have and decide the case as I have told you upon what happens here in the courtroom, not what you might have read about the case, not what your neighbors might have discussed with you, but if you can lay that aside and decide that case based upon what you hear in the courtroom, then you are qualified to be a juror.
>
> Can you do that, sir?
>
> [THE JUROR]: I can try.
>
> THE COURT: I guess that is all we can really ask you to do, sir."

■ Appellants moved for a mistrial on the basis that jurors must set aside their opinions, not simply try to do so. The mo-

tion was denied and its denial is assigned as a separate count of error. While we agree jurors must do more than try, we find no error in either the denial of the motion or in the standard utilized for jury selection. The exchange between the court and the juror, while occurring in the presence of the entire panel, occurred very early on the first day of the three-day jury selection process. During that process, each venireman was individually questioned by court and counsel outside the presence of the other potential jurors. Any venireman stating he would only "try" to set aside an opinion was excused by the court. The trial judge did not err. See *State v. Clayton*, 109 Ariz. 587, 592–93, 514 P.2d 720 (1973).

■ Citing *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), appellants argue jurors with knowledge of appellants' other crimes should have been automatically excused. Appellants also urge us to require the disqualification of jurors holding opinions on guilt of the crimes charged regardless if the opinion can be set aside. The Supreme Court laid down the *Marshall* rule in the exercise of its supervisory power over the federal courts. The rule has no application to the state courts. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). We reject both *per se* rules urged by appellants, preferring the test announced in *State v. Schmid*, 109 Ariz. 349, 353, 509 P.2d 619 (1973), that knowledge or opinion about the crime charged, collateral crimes or the defendant personally is not enough to disqualify a juror absent an inability to set aside the knowledge or opinion.

■ Appellants also contend the trial judge "intimidated" the jurors into testifying that they could set aside their knowledge and opinions, when in fact they could not. We believe the record reflects otherwise. Instead of intimidation, we see the trial judge taking great pains to explain to the jurors that they could serve as jurors

---

2. The uncertainty in the number excused for fixed opinions is attributable to one juror who, while stating he could set aside his opinion of

guilt, could not set aside the fact that these particular appellants did not testify.

even though they were aware of facts or even held opinions of guilt as long as they swore to set them aside. Such a concept is difficult to grasp to those unfamiliar with legal thinking and, at times, posed difficulty to this particular panel, of which only a few had served previously as jurors. Even appellants' counsel had difficulty grasping this concept. Appellant Greenawalt's attorney argued that the more intelligent jurors "are intelligent enough to know that they cannot totally set these matters aside, and that they cannot honestly say they will not be influenced by them", while the less intelligent jurors "aren't so introspective and don't look at things, they aren't willing to analyze and consider carefully the issues." We reject this argument since it is premised on the fact, which we do not find, that the publicity in this case was extremely prejudicial and pervasive. We further reject the argument since its result is that no one, not even a judge, could ever try this case. This simply is not the law. The law presumes some people, even intelligent ones, can be dispassionate.

■ In their last assignment of error regarding pretrial motions, appellants argue they were entitled to a continuance to combat the effect of publicity, particularly after Ricky Tison's overnight escape from the Pinal County Jail one week before the trial. As stated previously, this motion is directed to the trial court's discretion. In light of the utter lack of evidence of community prejudice and the statements of those jurors with knowledge of the escape that they would set aside that knowledge, we find no abuse of discretion. We do not find any indication appellants were denied a trial by fair and impartial jurors. Nor do we find any abuse of discretion in the trial judge's refusal to change venue or venire or in refusing to grant a continuance.

■ Moving to the substantive charges against appellants, they argue the trial court erred in not granting a directed verdict as to the counts of assault with a deadly weapon committed against the civilians during the prison escape. As to this, there was testimony that appellants were holding revolvers and shotguns, that they ordered the civilians to stand against a wall and no one would "get hurt" and that later the civilians were escorted to and locked in a storage closet. Testimony also showed that one of the armed appellants "covered" the door to the closet as each person was lead into it and that a shotgun was pointed into the crowded closet as the door was shut. Appellants argue this evidence fails to show assault with a deadly weapon since there was no testimony that appellants pointed their guns directly at each civilian.

Assault with a deadly weapon is the attempt, with criminal intent, to commit a physical injury on another, coupled with the use of a deadly weapon in that attempt and the then present ability to accomplish the injury. *State v. Gordon,* 120 Ariz. 172, 584 P.2d 1163 (1978). When traditional deadly weapons are used, as here, the law does not impose stringent definitions on intent and attempt. The only intent required is general intent, that is, the defendant need only intend the acts which he performs. *State v. Bustamonte,* 122 Ariz. 105, 593 P.2d 659 (1979). As for attempt, we recently held that that does not require the pointing of a gun in a threatening manner. *State v. Van Dyke,* 127 Ariz. 335, 621 P.2d 22 (1980). In a more general statement, we have said:

> "when a person holds a deadly weapon in a position so that it could immediately be used to physically injure another, he need go no further toward the completion of a battery in order to satisfy the 'attempt' element inhering in A.R.S. § 13–249."

*State v. Gordon,* supra, 120 Ariz. at 175, 584 P.2d 1163.

■ When the evidence is considered in the light most favorable to the State and all inferences drawn against appellants, *State v. Pittman,* 118 Ariz. 71, 574 P.2d 1290 (1978), it is apparent substantial evidence exists to support a finding that the guns were held in a manner so they could be used to immediately injure the civilians. There is no requirement that a weapon be directly and solely pointed and leveled at every person. It is sufficient that the civilians were "covered" since from that fact the jury

could have inferred that the guns could be used to immediately injure the civilians. This is in accord with our holding that a jury could find attempt where a defendant "attempted to bring the pistol to bear on" the victim, but did not actually point the pistol at him. *State v. Seymour,* 101 Ariz. 498, 499, 421 P.2d 517 (1966).

■ Appellants object to the admission of numerous rifles and pistols into evidence. In their brief, appellants refer to Exhibits 1 through 12 and 22. Exhibit 22 was withdrawn and never admitted. No objection was made to the admission of Exhibits 5 and 10, hence their admission cannot be made the grounds for error. *State v. Glasco,* 124 Ariz. 454, 605 P.2d 33 (1980). The objection to the other weapons is that there was no evidence that they had been fired or even that they were pointed out of the van during the roadblock incident. For authority, appellants cite *State v. Gallagher,* 97 Ariz. 1, 396 P.2d 241 (1964), where we held inadmissible a knife and scabbards found in appellant's car since "[n]one of these items were properly connected to the crime in question and had nothing to do with appellant's guilt or innocence." *Id.* at 8, 396 P.2d 241. The meaning of "properly connected to the crime in question" is unclear. Appellants take it to mean that unless a weapon was shown to have been fired or to have been pointed out of the van, the weapon was irrelevant since its admission did not make the fact of assault with a deadly weapon any more probable than not. We believe appellants' argument and interpretation of *Gallagher* confuses relevancy with the sufficiency of the State's evidence to avoid a directed verdict. We have said:

> "evidence is relevant if it has *any basis* in reason to prove a material fact in issue. It is not necessary that such evidence be sufficient to support a finding of ultimate fact; it is enough if the evidence, if admitted, would render the desired *inference* more probable. Udall, Arizona Law of Evidence, § 111 [p. 206] (1960)." *Reader v. General Motors Corporation,* 107 Ariz. 149, 155, 483 P.2d 1388 (1971) (emphasis added).

*United States v. McCoy,* 517 F.2d 41 (7th Cir. 1975) provides a good illustration of this principle. There the appeals court held in a prosecution for passing a counterfeit bill that the trial court properly admitted other bills found in a store manager's office several days after the defendant had been detained there unattended since the bills "had a tendency to prove that the first bill had not been passed innocently." *Id.* at 44. See also Weinstein, Evidence ¶ 401 [06], pp. 401–21.

■ Officers involved in the roadblock incident testified multiple gunshots were directed at them from multiple sources within the van. There was testimony that these weapons were discovered in the abandoned van or near where appellants hid in the desert at the time of their arrest. Such facts make it more probable than not that some or all of the weapons were used to assault the officers at the roadblocks. Additionally, they make it more probable than not that appellants knowingly eluded a police car, another crime charged, with the large number of weapons further suggesting appellants freely aided and abetted the criminal activity and were not coerced into crime. A sufficient connection was established between the weapons and the crimes charged. We reject the idea that only those weapons actually shown to have been used in the assaults were admissible. Any implication in *State v. Gallagher, supra,* to the contrary is disapproved.

■ It is also contended the weapons should have been excluded since their prejudice outweighed their probative value. This argument is spurious. Numerous witnesses described these weapons and testified how and where the weapons were discovered. The weapons apparently were even exhibited to the jury during this testimony. All this was done without objection and long before the weapons themselves were admitted into evidence. We see no new special prejudice arising from the admission of the actual weapons. The analogy to unreasonably gruesome pictures is not convincing.

Appellants complain the trial judge incorrectly refused a requested instruction to the effect: "Guilt cannot be established by mere association or by presence of a person at scene [sic] even with knowledge that a crime is being committed." This instruction misstates the law and would have misled the jury since mere presence can evidence aiding and abetting where there is preconcert. *State v. Hernandez*, 112 Ariz. 246, 247, 540 P.2d 1227 (1975). There was also no error committed when a simple assault instruction was refused since there was no evidence to support it. See *United States v. Enos*, 453 F.2d 342 (9th Cir. 1972) (federal prosecution of American Indian for violation of A.R.S. § 13–249); *State v. Sanders*, 110 Ariz. 503, 505, 520 P.2d 1127 (1974). We agree with the prosecutor's statement in the trial below, which is similar to the trial judge's comments in *United States v. Enos, supra*:

> "Your Honor, it would seem to me that there is either assault with a deadly weapon or there may not have been any type of assault at all."

or as the trial judge below replied:

> "Well, it appears to me there were either guns used there or not. If there were guns out there, it is assault with a deadly weapon."

Appellant Raymond Tison argues the trial court erred in refusing to appoint an investigator. He concedes A.R.S. § 13–1673 (now A.R.S. § 13–4013(B)), providing for the appointment of experts, only applies in capital cases. He further presents no evidence that prejudice, substantial or not, arose from the denial resulting in an unfair trial. There was no error. See *State v. Peeler*, 126 Ariz. 254, 614 P.2d 335 (App. 1980).

Appellants assign two other alleged errors, but they concede the errors do not amount to reversible error and were waived at trial. Appellants correctly point out that the Second Amended Judgment as to Raymond Tison contains two clerical errors.

Our independent review of the record reveals a clerical error in the Amended Judgment as to Ricky Tison. These typographical errors do not require reversal or remand. See *State v. Pieck*, 111 Ariz. 318, 320, 529 P.2d 217 (1974); A.R.S. § 12–2103(A), 4 A.R.S.

It is ordered that any reference to Counts XIV and XIX, Cause Number 7979 in Raymond Tison's formal judgment be deleted and that any reference to Count XIV, Cause Number 7979 in the sentence for Count IX, Cause Number 8007 in Ricky Tison's formal judgment be changed to Count XIX, Cause Number 7979.[3]

Convictions and sentences affirmed.

HOLOHAN, V. C. J., and HAYS, CAMERON and GORDON, JJ., concur.

---

3. Count XIV, Cause Number 7979, was dismissed as to all appellants prior to trial. Count XIX Cause Number 7979, was the charge of bringing prohibited articles into prison. Only Ricky Tison, not Raymond Tison, was convicted on this count.