784 F.2d 1453
 Randy GREENAWALT, Petitioner-Appellant,
v.
James R. RICKETTS, Director of Corrections; Donald
Wawrzasek, Superintendent of the Arizona State
Prison; and Robert K. Corbin, Attorney
General, State of Arizona,
Respondents-Appellees.
 No. 84-2752.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 4, 1985.
Decided March 20, 1986.
 
 C. Steven McMurry, Curtis Ullman, Gammage & Burnham, Phoenix, Ariz., for petitioner-appellant.
 Bruce M. Gerg, Asst. U.S. Atty., Tucson, Ariz., for respondents-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before BROWNING, SNEED, and HUG, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This is an appeal from the denial by the district court of a petition for a writ of habeas corpus. We reverse and remand for further proceedings with respect to the petition.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 On July 30, 1978, Randy Greenawalt and Gary Tison, inmates at Arizona State Prison in Florence, Arizona, received guns from two of Tison's sons, Ricky and Raymond. The two prisoners escaped to a nearby green Ford sedan driven by Gary Tison's son, Donald. Soon after the escape, the five men (termed the "Tison gang" by the press) transferred to a white Lincoln Continental and drove away.
 
 
 3
 On August 6, 1978, state employees discovered the bodies of John and Donnelda Lyons and their son Christopher near the abandoned Lincoln Continental, in the area around Quartzsite, in Yuma County, Arizona. On August 11, 1978, searchers at the site found the body of Theresa Tyson, the Lyonses' niece. All four victims had been shot to death. Evidence implicating the escapees included (1) Greenawalt's palm print on the outside of the car, (2) Raymond Tison's fingerprint inside the car, and (3) gun shells that matched the guns recovered from the escapees when they were captured. Forensic experts determined that the victims died at some time between July 31 and August 2, 1978.
 
 
 4
 Greenawalt and the Tisons attempted to drive a stolen van through a pair of police roadblocks on August 11, 1978. When the van went off the road during a high-speed chase, the police captured Greenawalt, Ricky Tison, and Raymond Tison. Donald Tison died during the chase. Gary Tison, who escaped capture at the roadblock site, died of exposure in the surrounding desert.
 
 
 5
 Around 3:00 A.M. on August 11, officers gave Greenawalt and the two surviving Tisons a pat-down search, handcuffed them, and placed them in a pickup truck. About half an hour later, the police moved the pickup to a different location, strip-searched the men (retaining their clothes as evidence), and left them, naked, in the truck. At some point later that morning, the men received wool blankets to wear. At approximately 5:00 A.M., the escapees were taken to separate vehicles.
 
 
 6
 Warden Caldwell read Greenawalt the Miranda warning and then asked him if he had any statements to make. Greenawalt refused to make any statements and requested an attorney. Cardwell did not ask Greenawalt any further questions at that time. Later in the day, two Pinal County Detectives, Tom Solis and Ed Harwell, arrived to question Greenawalt. Cardwell may or may not have told one of the two detectives about Greenawalt's request for a lawyer. In any event, Harwell also read the prisoner the Miranda warning and asked him if he needed medical attention. When Harwell began to ask Greenawalt about Theresa Tyson, Greenawalt again requested a lawyer. Detective Solis, a short while later, asked Greenawalt if he already had a lawyer and if he would like to talk. Greenawalt responded that, although he did not want to talk at that time, he would talk to Solis later. The conversation with Solis ended around 7:00 A.M.
 
 
 7
 Sometime between 7:30 and 8:00 A.M., Corrections Director Ellis McDougall, who evidently had not heard about Greenawalt's request for an attorney but knew that he had been notified of his Miranda rights, met with the prisoner. McDougall said that he didn't want to talk about any crimes but was wondering about the location of Theresa Tyson. Greenawalt answered some questions but then requested a lawyer. At approximately 8:30 A.M., McDougall asked Assistant Warden Dwight Burd to talk to the prisoner; McDougall probably did not pass along Greenawalt's request for an attorney. Burd, who had known Greenawalt for three years, testified that he did not know that Greenawalt had already refused to talk to the police. He, too, questioned Greenawalt for a while. The questioning stopped--at about the point when Burd asked Greenawalt who had owned the stolen van--when Greenawalt repeated his request for a lawyer.
 
 
 8
 Sometime between 8:30 and 9:24 A.M., McDougall approached Greenawalt again, and Greenawalt refused to talk to him. At 9:24 A.M., Department of Public Safety Agent David Sanchez gave the prisoner the Miranda warning again. Greenawalt refused to answer questions until he was given an attorney. He was then taken to the Pinal County jail around 11:30 A.M. and was examined by a doctor between 12:30 and 1:00 P.M. Earlier, at around 11:00 A.M., attorney Robert Brown had learned that he would be Greenawalt's counsel. The jail personnel did not permit Brown to see Greenawalt until 1:00 P.M.; at that time, the two men spoke for 10 or 15 minutes through a slit in a metal door, with a prison guard standing next to Greenawalt.
 
 
 9
 At 2:00 P.M., Tom Brawley, a detective who had known Greenawalt since 1974, questioned him. Brawley testified that he did not know about any previous attempts at interrogation. When Brawley entered the cell, Greenawalt was sleeping. Brawley woke him, brought him coffee and a cigarette, and chatted with him for a while. Then Brawley told him that he had come to ask questions and he read Greenawalt his rights from a waiver. Greenawalt refused to sign the waiver. It was at this point in the interrogation process that he made his most incriminating statements. His refusal to sign the waiver was coupled with the statement that he "wanted to clear up the news media stories of Teresa [sic] Tyson." When Brawley asked him to clarify that remark, he replied, "We didn't kidnap the girl, nor was she sexually molested." Brawley responded by asking where Theresa Tyson was located, since she had not been found with the other bodies. Greenawalt responded, "Well, we left her there.... [J]ust look around because she has to be there." Brawley asked whether she had been shot. Greenawalt answered, "You goddamn right she was shot." 6 R.T. at 898-99.
 
 
 10
 Greenawalt was tried in Arizona for the four Yuma County killings. Ricky and Raymond Tison agreed to testify against him in exchange for the state's agreement not to seek the death penalty for them. The Yuma County Attorney mentioned their proposed testimony in his opening argument. When the Tison brothers reneged on their agreement, the trial judge declared a mistrial. At the second trial, the prosecution argued that Greenawalt had committed first degree murder by violating Ariz.Rev.Stat.Ann. Sec. 13-452, which dealt with killings "committed in avoiding or preventing lawful arrest or effecting an escape from legal custody, or in perpetration of ... robbery ... [or] kidnapping." The jury convicted Greenawalt on four counts of first degree murder, kidnapping, robbery, and theft. At a separate capital sentencing hearing, the trial judge sentenced him to death based on the murder conviction.
 
 
 11
 The Arizona Supreme Court affirmed the conviction and sentence in State v. Greenawalt, 128 Ariz. 150, 624 P.2d 828 (en banc), later proceeding, 128 Ariz. 388, 626 P.2d 118 (1981) (en banc), and the United States Supreme Court denied certiorari on October 5, 1981, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191. Greenawalt then filed a petition for post-conviction relief in state court. That petition was denied, 128 Ariz. 388, 626 P.2d 118 (1981) (en banc), as was his December 21, 1981 petition for a writ of habeas corpus filed in the district court in Arizona. The district court denied the petition on the ground that he had not exhausted his state court remedies. Greenawalt later filed an amended petition for a writ of habeas corpus on May 31, 1984.
 
 
 12
 The district court issued a memorandum opinion and order on August 6, 1984, denying the petition and, on December 13, 1984, issued an amended opinion denying the petition. Greenawalt filed his notice of appeal on time.
 
 II.
 DISCUSSION
 
 13
 Greenawalt raised numerous issues on appeal from the denial of his petition for a writ of habeas corpus. Because we reverse and remand to enable the district court to apply Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), to the facts of this case, we believe that to conserve judicial resources we should decline to reach the other issues.
 
 
 14
 The district court noted in one line of its disposition that, if Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), were applied to Greenawalt's case, the statements to Detective Tom Brawley would not have been admissible.[1] The court, however, interpreted a recent Supreme Court decision, Solem v. Stumes, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984), to preclude the application of Edwards and found that Greenawalt's statements to Brawley were voluntary. In Solem v. Stumes, the Court held that Edwards would not be applied "retroactively," since Edwards had not been " 'clearly' or 'distinctly' foreshadowed" by previous law. Id. at 649, 104 S.Ct. at 1345. Also, in Stumes, direct appeals were exhausted prior to the date of the Edwards decision and the case was before the Supreme Court as a result of the prisoner's collateral attack on his conviction. Subsequently, the Supreme Court further clarified its Stumes decision by holding that Edwards was applicable to all cases pending on direct review at the time of Edwards. See Shea v. Louisiana, --- U.S. ----, 105 S.Ct. 1065, 1071, 84 L.Ed.2d 38 (1985). Edwards remains inapplicable to all cases in which direct review has been completed prior to the Edwards decision date.
 
 
 15
 Greenawalt contends his case is governed by Shea, v. Louisiana, --- U.S. ----, 105 S.Ct. 1065, 84 L.Ed.2d 1065 (1985), not Stumes. He relies on language in Shea at ---, 105 S.Ct. at 1068 n. 3, 84 L.Ed.2d 1065 (1985). That note reads in part: "Had petitioner's [Shea's] case been pending here on certiorari when Edwards was announced, it surely would have been remanded, as were other such cases, for reconsideration in the light of Edwards." Edwards was decided on May 18, 1981, and Greenawalt filed his petition for certiorari on May 11, 1981. Certiorari, as already mentioned, was denied on October 5, 1981. The Court, as Shea's footnote 3 indicated, did remand other cases in light of Edwards. See Blakney v. Montana, 451 U.S. 1013, 101 S.Ct. 2999, 69 L.Ed.2d 384 (1981); White v. Finkbeiner, 451 U.S. 1013, 101 S.Ct. 3000, 69 L.Ed.2d 385 (1981); Leuschner v. Maryland, 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385 (1981); Monroe v. Idaho, 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 385 (1981); Wantland v. Maryland, 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 386 (1981); James v. Illinois, 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 386 (1981).
 
 
 16
 The footnote 3 of Shea and the denial of Greenawalt's petition for certiorari present us with a dilemma. Either the Supreme Court's footnote 3 should be completely ignored and this case analyzed uninfluenced by that footnote, or the Supreme Court did not believe that the questioning of Greenawalt violated the rule of Edwards, or the denial of certiorari, despite the language of footnote 3, indicates nothing with respect to whether Greenawalt's questioning violated Edwards. This being a capital case, we must accept and be governed by the third alternative. Moreover, this is consistent with the long acknowledged principle that denials of certiorari are not decisions on the merits and carry no precedential value. United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361 (1923); 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice p 0.402, at 30-31 (2d ed. 1984).
 
 
 17
 It follows that we reject the government's contention that the Supreme Court previously held that Edwards was inapplicable to the facts of this case. Moreover, because Greenawalt's petition for certiorari following direct review of his conviction by the Supreme Court of Arizona was pending when Edwards was decided and was thereafter denied, we hold that this case is governed by Shea and not Stumes. That is, Greenawalt's case was pending on direct review at the time Edwards was decided and thus was entitled to the degree of retroactivity of Edwards that Shea permits. In short, Edwards must be applied to the facts of Greenawalt's questioning.
 
 
 18
 Because we are reluctant to accept as conclusive the district court's one-line statement that Brawley's questioning violated Edwards,[2] and because on the basis of this record we are uncertain what the consequences of any such violation should be, we remand this case to the district court for a thorough and reasoned application of Edwards to the facts of this case. Therefore, we reverse and remand this case.
 
 
 19
 REVERSED AND REMANDED.
 
 
 
 [1]
 E.R. item 7 at 17
 
 
 [2]
 Edwards held that "an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85, 101 S.Ct. at 1885. An argument may be made that Greenawalt's 10-15 minute consultation with his lawyer, conducted through a small hole in a door, with a jailer standing next to the prisoner, constituted making counsel "available" to him. We express no opinion regarding the merits of this argument