734 P.2d 563

**STATE of Arizona, Appellee,**

v.

**Walter Burnhart LaGRAND, Appellant.**

No. 6457.

Supreme Court of Arizona.

Jan. 30, 1987.

22

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Crim. Div., Diane M. Ramsey, Gary A. Fadell, Asst. Attys. Gen., Phoenix, for appellee.

O'Dowd, Burke & Lundquist by Bruce A. Burke, Tucson, for appellant.

GORDON, Chief Justice.

On February 17, 1984, appellant Walter LaGrand and his half-brother, Karl Hinze LaGrand, were convicted by a jury of murder in the first degree; attempted murder in the first degree; attempted armed robbery; and two counts of kidnapping. Both were sentenced to death for the first degree murder and to concurrent terms of years for the other charges. Both brothers challenge their convictions and sentences; however, their appeals have not been consolidated and we address issues raised by each in separate opinions. We have jurisdiction to hear Walter LaGrand's appeal pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13-4031 and -4033.

This case arises from a series of events which occurred during a bungled attempt to rob the Valley National Bank in Marana, Arizona, on January 7, 1982. That morning Walter and Karl LaGrand drove from Tucson, where they lived, to Marana intending to rob the bank. They arrived in Marana sometime before 8:00 a.m. Because the bank was closed and empty the LaGrands drove around Marana to pass time. They eventually drove to the El Taco restaurant adjacent to the bank. Ronald Schunk, manager of El Taco, testified that he arrived at work at 7:50 a.m. The moment he arrived, a car with two men inside drove up to the El Taco. Schunk described the car as white with a chocolate-colored top. The car's driver, identified by Schunk as Walter LaGrand, asked Schunk when the El Taco opened. Schunk replied, "Nine o'clock." The LaGrands then left.

Dawn Lopez arrived for work at the bank at approximately 8:00 a.m. When she arrived at the bank she noticed three vehicles parked in the parking lot: a motor home; a truck belonging to the bank manager, Ken Hartsock; and a car which she did not recognize but which she described as white or off-white with a brown top. Because Lopez believed that Hartsock might be conducting business and desire some privacy she left the parking lot and drove around Marana for several minutes. She returned to the bank and noticed Hartsock standing by the bank door with another man whom she did not recognize. Lopez parked her car and walked toward the bank entrance where Hartsock was standing. As she passed the LaGrands' car Walter emerged from the car and asked her what time the bank opened. Lopez replied, "Ten o'clock." Lopez continued walking and went into the bank. When she entered the bank she saw Hartsock standing by the vault with Karl LaGrand. Karl was wear-

ing a coat and tie and carrying a briefcase. Karl told her to sit down and opened his jacket to reveal a gun, which was later found by the police to be a toy pistol. Walter then came through the bank entrance and stood by the vault. Lopez testified that Walter then said, "If you can't open it this time, let's just waste them and leave." Hartsock was unable to open the vault because he had only one-half of the vault combination.

The LaGrands then moved Lopez and Hartsock into Hartsock's office where they bound their victims' hands together with black electrical tape. Walter accused Hartsock of lying and put a letter opener to his throat, threatening to kill him if he was not telling the truth. Lopez and Hartsock then were gagged with bandannas.

Wilma Rogers, another bank employee, had arrived at the bank at approximately 8:10 a.m. Upon arriving Rogers noticed two strange vehicles in the parking lot and, fearing that something might be amiss, wrote down the license plate numbers of the two unknown vehicles. She then went to a nearby grocery store and telephoned the bank. Lopez answered the phone after her gag was removed; her hands remained tied. Karl held the receiver to Lopez' ear and listened to the conversation. Lopez answered the phone. Rogers asked for Hartsock but Lopez denied that he was there, which struck Rogers as odd because she had seen his truck in the bank parking lot. Rogers then told Lopez that her car headlights were still on, as indeed they were. Rogers told Lopez that if she did not go out to turn her headlights off, then she would call the sheriff. A few minutes later Rogers asked someone else to call the bank and they also were told that Hartsock was not there. Rogers then called the town marshal's office.

After the first telephone call the LaGrands decided to have Lopez turn off her headlights. Her hands were freed and she was told to go turn off the lights but was warned that "If you try to go—if you try to leave, we'll just shoot him and leave. We're just going to kill him and leave." Lopez went to her car and turned off the

lights. Upon her return to the bank her hands were retied. Hartsock was still bound and gagged in the same chair. Lopez was seated in a chair, and turned toward a corner of the room. Lopez testified that soon thereafter she heard sounds of a struggle. Fearing that Hartsock was being hurt, Lopez stood up, broke the tape around her hands and turned to help him. Lopez testified that for a few seconds she saw Hartsock struggling with two men. Karl was behind Hartsock holding him by the shoulders while Walter was in front. According to Lopez, Walter then came toward her and began stabbing her. Lopez fell to the floor, where she could see only the scuffling of feet and Hartsock lying face down on the floor. She then heard someone twice say, "Just make sure he's dead."

The LaGrands left the bank and returned to Tucson. Lopez was able to call for help. When law enforcement and medical personnel arrived at the bank Hartsock was dead. He had been stabbed 24 times. Lopez, who had also been stabbed multiple times, was taken to University Hospital in Tucson.

Law enforcement personnel quickly identified the LaGrands as suspects. By 3:15 p.m., police had traced the license plate number to a white and brown vehicle owned by the father of Walter's girl friend, Karen Libby. The apartment where the LaGrands were staying with Karen Libby was placed under surveillance. Shortly thereafter Walter, Karl and Karen Libby left the apartment and began driving. They were followed and soon pulled over. Walter and Karl were then arrested and the car was searched. Karen Libby's apartment was also searched and a steak knife similar to one found at the bank was seized. Karl's fingerprint was found at the bank. A briefcase containing a toy gun, black electrical tape, a red bandanna, and other objects was found beneath a desert bush and turned over to the police.

After their arrest Walter and Karl were taken to DPS headquarters in Tucson. At DPS headquarters and later at St. Mary's Hospital, Karl confessed to the crimes to Detective Weaver Barkman but stated that

he alone stabbed Hartsock and Lopez while Walter was out of the room. Karl maintained that he panicked when Hartsock kicked him in the leg and grabbed a letter opener with which he stabbed the victims.

At trial Walter testified and denied any role in the stabbings. Walter admitted that he intended to rob the bank but testified that he was outside in the parking lot when the stabbings occurred. He testified that upon his return to the bank to get the car keys he found Karl shaking and crying and heard Karl say, "I killed him. I didn't mean to do it. I panicked. He kicked me." Walter also called psychologist Dr. Geoffrey Loftus as an expert witness to testify regarding effects of stress upon memory. Loftus testified that extreme stress, such as that induced by fear of injury or death, reduces the ability to accurately recall details. Walter used Loftus' testimony to attack Lopez' testimony that Walter was present during the stabbings and had stabbed her.

Karl did not take the stand and his confessions were not admitted into evidence. The trial court instructed the jury on first degree murder (both premeditated and felony murder), second degree murder, attempted first degree murder, attempted armed robbery, and kidnapping. After a two-week trial the jury convicted Walter and Karl of first degree murder (Count I), attempted first degree murder (Count II), attempted armed robbery (Count III), and two counts of kidnapping (Counts IV and V). Counts II–V were found to be dangerous and repetitive. Walter and Karl were sentenced identically: on Count I to death; on Count II to aggravated sentences of 28 years; on Count III to aggravated sentences of 20 years; and on Counts IV and V to 28 years each. Sentences were concurrent on Counts II–V but consecutive to Count I and any sentence then being served.

Walter raises six issues for consideration by this Court: (1) the refusal to admit Karl LaGrand's confessions into evidence, (2) the refusal to give a lesser included offense instruction regarding felony murder, (3) admission of gruesome photographs without adequate foundation, (4) excuse for cause of a juror with scruples against the death penalty, (5) denial of a change of venue, and (6) propriety of the death penalty in this case.

## ADMISSIBILITY OF CONFESSIONS

While in custody Karl LaGrand twice confessed to stabbing the victims but claimed that Walter was not in the room at the time. Admission of confessions was eventually denied on hearsay grounds with no saving exception, but not before a series of legal maneuvers worthy of Lewis Carroll.

We begin, however, with an examination of the circumstances surrounding Karl's confessions. The LaGrands were arrested late in the afternoon of January 7, 1982. After their arrest they were separated and transported to DPS headquarters in Tucson. Both men were given *Miranda* warnings, and both invoked their rights to remain silent and speak to an attorney. However, law enforcement personnel determined that Karl was in a "weak emotional state" and ripe for interrogation. The police consulted with the County Attorney's office which told them to interrogate Karl despite his clear invocation of *Miranda*. [1]

The questioning lasted for approximately 2–3 hours, during which time Karl was often upset and hyperventilating. Detective Barkman testified that at one point Karl had a nosebleed but law enforcement personnel denied hitting him. Barkman admitted that he "shook" Karl to calm him down and may have slapped him once. Barkman also described a range of psychological tricks he used on Karl. Karl admitted that he stabbed Hartsock and Lopez but claimed that he did it only because he panicked. Karl said that he was alone in the office with the victims at the time and placed Walter at the bank's front entrance. He stated that Hartsock kicked him and

---

1. Detective Barkman testified that he decided to interrogate defendant independent of advice received from the County Attorney's office.

Lopez began screaming, and in a panic he grabbed a letter opener and stabbed them "but not on purpose".

After confessing, Karl was taken to the county jail to be booked on charges. Within minutes of arrival, Karl fainted. He was then driven to St. Mary's Hospital. The triage nurse at St. Mary's described Karl as upset, crying and hyperventilating. At some point Karl asked to speak again with Barkman. Barkman was summoned to the hospital and took Karl into an examination room where they spoke alone. Prior to their conversation Barkman re-read Karl his *Miranda* rights and later taped portions of the interview.

During this questioning Karl again admitted stabbing the victims and repeated his claim that Walter was out of the room, although other details differed from his earlier confession. After Barkman finished questioning Karl he was examined by the emergency room physician. The doctor stated that Karl was emotionally distraught and decided to give Karl a powerful anti-psychotic drug. The doctor admitted that hyperventilation could decrease mental faculties and impair judgment.

■ Prior to trial both Walter and Karl moved to suppress the confessions on the ground that they were involuntary. In Arizona confessions are presumed to be involuntary. *State v. Finehout*, 136 Ariz. 226, 231, 665 P.2d 570, 575 (1983); *State v. Knapp*, 114 Ariz. 531, 538, 562 P.2d 704, 711 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). The burden rests with the state to prove by a preponderance of the evidence that a confession is free and voluntary and not the product of physical or psychological coercion. *State v. Adams*, 145 Ariz. 566, 569, 703 P.2d 510, 513 (App.1985). Ordinarily this determination is made at a "voluntariness hearing" at which the trial court examines the totality of the circumstances surrounding a confession and determines whether the state has met its burden. *State v. Knapp, supra.*

After the suppression hearing the trial court ruled that Karl's confessions were taken in violation of *Miranda* and were involuntary. Accordingly, the court granted Karl's motion to suppress. The Pima County Attorney's Office filed a Special Action with the court of appeals challenging the ruling.

At this point the attorneys began to re-examine their positions "through the looking glass." Walter filed a motion to determine the voluntariness of Karl's statements, which was joined by the state but opposed by Karl. However, Karl then decided to join forces with Walter and the state. All three parties filed a proposed stipulation with the court in which they stipulated that Karl's confessions were taken in violation of *Miranda* but were voluntary and not coerced. This unusual congruity of strategy arose because the state wanted to use the confessions to impeach Karl if he testified; Walter wanted the confessions to be admissible in order to corroborate his testimony; and Karl decided he wanted the confession to be usable at sentencing since they painted a less damning picture of the events than the victims' testimony.

Pursuant to the stipulation of counsel the trial court reluctantly agreed to modify the previous order. The modified order vacated the court's determination of voluntariness and concluded, "[T]he court makes no findings or ruling thereon."

Prior to trial Walter sought to have Karl's confessions ruled admissible under 17A A.R.S. Rules of Evid., Rule 804(b)(3). The state, which had once fought to prove the voluntariness of the statements, now opposed admission of the confessions on the ground that they were untrustworthy hearsay. The trial judge excluded the statements at trial.

### A.

Arizona Rules of Evidence admit hearsay confessions which exculpate a co-defendant. Rule 804(b)(3) provides:

"**Rule 804. Hearsay Exceptions; Declarant Unavailable**

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\*　　\*　　\*　　\*　　\*　　\*

(b)(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Ordinarily, admission of evidence is within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion. *State v. Fisher*, 141 Ariz. 227, 242, 686 P.2d 750, 765, *cert. denied*, 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984); *State v. Macumber*, 119 Ariz. 516, 521, 582 P.2d 162, 167, *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). However, because parameters of Rule 804(b)(3) are not yet well-defined in Arizona, this important area of the law merits our attention.

The first requirement of Rule 804(b)(3) is that the declarant be unavailable. A declarant is considered unavailable if he asserts his privilege against self-incrimination. 17A A.R.S. Rules of Evid., Rule 804(a)(1); *see State v. Fisher, supra.* A declarant need not expressly assert the privilege if his unavailability is "patent" and assertion of the privilege is a mere formality. *United States v. Thomas*, 571 F.2d 285, 288 (5th Cir.1978). Here Karl stated throughout pretrial proceedings that he would not take the stand, and as a co-defendant he obviously could not be compelled to testify. Despite the absence of a formal assertion of his Fifth Amendment right and court ruling, it is plain that Karl was "unavailable" within the meaning of the Rules.

The second requirement is that the statement be against the declarant's interest. Rule 804(b)(3) does not require a direct confession of guilt, *United States v. Benveniste*, 564 F.2d 335, 341 (9th Cir.1977), though that exists here. "Rather, by referring to statements that 'tend' to subject the declarant to criminal liability, the Rule encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." *United States v. Thomas*, 571 F.2d at 288; *accord*, *United States v. Barrett*, 539 F.2d 244, 251 (1st Cir.1976). There is no question that Karl's statements tended to subject him to criminal liability; indeed, they were direct confessions of guilt.

The third requirement of the Rule is that corroborating circumstances exist which clearly indicate the trustworthiness of the exculpatory statement. "Unfortunately, the precise meaning of the corroboration requirement in Rule 804(b)(3) is uncertain, and is not much clarified by either legislative history or the cases." *United States v. Silverstein*, 732 F.2d 1338, 1346–47 (7th Cir.1984). Although it would be impossible to articulate a complete list of factors to be considered when evaluating the trustworthiness of the declarant's statement, we believe evidence in this case presents seven factors that suggest trustworthiness or lack thereof.

The first and most important factor is the existence of corroborating and contradictory evidence. In some cases, trustworthiness will be readily apparent if corroborating evidence abounds and contradictory evidence is nonexistent. In other cases, trustworthiness will be quickly negated by a plethora of contradictory evidence and an absence of corroborating evidence. In the majority of cases, however, both corroborating and contradictory evidence will exist. This circumstance will make examination of other factors necessary before the issue of trustworthiness can be resolved.

A second factor is the relationship existing between the declarant and the listener. A statement made to a law enforcement official may be made in an attempt to curry favor and obtain a reduced sentence. It may also be a product of coercion or force and be involuntary. Such a statement might not be as reliable as a statement made to a good friend or family member.

A third factor is the relationship between the declarant and the defendant. A strong

emotional or family bond between the declarant and defendant may render the declarant's statement less trustworthy because such a bond may motivate the declarant to fabricate his story.

The number of times the statement is made and the consistency of multiple statements may assist in determining trustworthiness. Statements which are repeated and are consistent are more trustworthy than statements which are repeated but inconsistent.

The amount of time which has passed between the event at issue and when the statements are made also should be considered. The degree of trustworthiness may relate inversely to the amount of time which passes between the event at issue and when the declarant makes his statements.

Whether the declarant will benefit from his statement is a sixth factor. A statement made by a declarant who will benefit therefrom is probably less reliable than a statement which does not benefit the declarant.

A seventh, but not necessarily final, consideration is the psychological and physical environment surrounding the making of the statement.

All of the above factors, to some extent, raise veracity-reliability-credibility questions about the declarant, the statement, or both. Such questions traditionally fall within the province of the jury rather than the judge. We do not believe that a judge should be able to bootstrap himself into the jury box via evidentiary rules. We therefore hold that a judge's inquiry, made to assure himself that the corroboration requirement of Rule 804(b)(3) has been satisfied, should be limited to asking whether evidence in the record corroborating and contradicting the declarant's statement would permit a reasonable person to believe that the statement could be true. If a judge believes that a reasonable person could conclude from corroborating and contradictory evidence in the record that the declarant's statement could be true, then the judge must admit the statement into evidence. A judge's role is to pass on questions of admissibility, and we believe that the judge impermissibly expands his role under Rule 804(b)(3) if he evaluates more than the corroborating and contradictory evidence when determining the trustworthiness of the declarant's statement.[2] Only after the statement is admitted into evidence should factors other than the corroborating and contradictory evidence be considered, and then only by the jury.[3]

2. Cf. *United States v. Silverstein*, 732 F.2d 1338 (7th Cir.1984):

> [I]t is unclear from the rule's language whether the judge may look beyond the evidence offered in corroboration of the statement to evidence either directly contradicting the statement or contradicting the evidence offered to corroborate it. If he may look beyond, the rule is open to the objection that it withdraws the credibility determination from the jury. But probably he may, in light of the Advisory Committee's admonition that "The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication."

*Id.* at 1347; *United States v. MacDonald*, 688 F.2d 224 (4th Cir.1982):

> [It is] my belief that, if the jury may be trusted with ultimate resolution of the factual issues, it should not be denied the opportunity of obtaining a rounded picture, necessary for resolution of the large questions, by the withholding of collateral testimony consistent with and basic to the defendant's principal exculpatory contention. If such evidence was not persuasive, which is what the government

essentially contends in saying that it was untrustworthy, the jury, with very great probability, would not have been misled by it.

*Id.* at 233 (Murnaghan, J., concurring), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983); *Commonwealth v. Drew*, 397 Mass. 65, 75 n. 10, 489 N.E.2d 1233, 1241 n. 10 (1986) ("In determining whether the declarant's statement has been sufficiently corroborated to merit its admission in evidence, the judge should not be stringent.... If the issue of sufficiency of the defendant's corroboration is close, the judge should favor admitting the statement. In most such instances, the good sense of the jury will correct any prejudicial impact."); 4 WEINSTEIN'S EVIDENCE ¶ 804(b)(3)[3] at 804–147 (1986 ed.) ("The corroboration requirement should not be used as a means of usurping the jury's function.").

3. We limit the judge's consideration of trustworthiness factors to corroborating and contradicting evidence in the record because this factor alone, unlike all other factors, in and of itself directly suggests trustworthiness or lack thereof.

The record does not indicate that the trial court limited its review of factors suggesting trustworthiness or lack thereof under Rule 804(b)(3) to evidence corroborating and contradicting Karl's statements. Thus, we will apply our new standard to the facts to determine if the court's ruling may be upheld. It is our duty to affirm a trial court's ruling provided the result is legally correct. *State v. Fisher*, 141 Ariz. at 245, 686 P.2d at 768.

■ Evidence both corroborating and contradicting Karl's statements exists. The following evidence corroborated Karl's statements: Karl did have a bruise on his leg as he stated; Lopez testified that she saw Hartsock kick someone; Lopez testified that only one person stabbed her; and Walter testified that he was out of the room when the stabbings occurred. The following evidence contradicted Karl's statements: Lopez testified that she saw Hartsock struggling with two men; Lopez testified that she was "positive" that Walter had stabbed her; Lopez testified that after being stabbed by Walter and falling to the floor one brother said to the other twice, "Just make sure he's dead"; and the forensic consultant who performed an autopsy on Hartsock testified that more than one instrument was used to inflict Hartsock's wounds.

After reviewing the above corroborating and contradicting evidence, we do not think that a reasonable person could conclude from the same corroborating and contradictory evidence that Karl's exculpatory statements could be true. The trial judge properly denied admission of Karl's statements.

### B.

■ In addition to the evidentiary issue, appellant raises a constitutional challenge to the exclusion of confessions based on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In *Chambers* the trial court refused to admit into evidence the fact that a man other than the defendant had admitted four times to killing the victim. This refusal was based on Mississippi's hearsay rule. Moreover, even though Chambers called the other man as a witness, Mississippi's common law "voucher" rule precluded him from impeaching his own witness. Chambers was subsequently convicted of the murder. On appeal the Supreme Court held that the four confessions should have been admitted despite their hearsay nature. The Court concluded that under some circumstances, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302, 93 S.Ct. at 1049.

Those circumstances are not present here. In *Chambers* the Court took great care to emphasize that the hearsay statements at issue were offered "under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. at 1048; *see also id.* at 302, 93 S.Ct. at 1049 ("The testimony rejected by the trial court here bore persuasive assurances of trustworthiness...."); *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979) (evidence corroborating excluded testimony was "ample" and "substantial reasons existed to assume its reliability"). We excluded Karl's exculpatory statements only after concluding that a reasonable man could not believe that the statements could be true after reviewing evidence both corroborating and contradicting the statements. Under such circumstances, we do not believe that we have applied Rule 804(b)(3) mechanistically, nor do we believe that exclusion of Karl's statements violated Walter's due process rights.

### LESSER INCLUDED OFFENSE INSTRUCTION

Appellant concedes that the trial court correctly applied the Arizona law of felony murder, A.R.S. § 13–1105(A)(2), under which there are no lesser included offenses

---

All other factors only indirectly suggest trustworthiness or lack thereof. We believe this "direct-indirect" line best delineates which factors should be considered by a judge and which factors should be considered by a jury.

to the charge. Appellant instead challenges the constitutionality of our long-standing rule. His attack is twofold: first, that failure to give lesser included offense instructions violates the federal mandate of *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); and second, failure to give lesser included offense instructions, in contrast to charges under A.R.S. § 13–1105(A)(1) (premeditated murder), violates equal protection.

### A.

Turning to appellant's first argument, we have already explained at length why *Beck* is inapposite to Arizona law. *See State v. Arias,* 131 Ariz. 441, 443–44, 641 P.2d 1285, 1287–88 (1982); *see also State v. Celaya,* 135 Ariz. 248, 660 P.2d 849 (1983). We decline to repeat ourselves now, except to reiterate that *Beck* was based upon an Alabama law very different from Arizona's. Nor does *Spaziano* aid appellant's case. In *Spaziano* the Supreme Court held that lesser included offense instructions need not be given where the statute of limitations has expired on lesser included crimes unless the defendant waives the statute of limitations. In other words, the Court declined to give defendants the benefit of both the lesser included offense instruction and an expired period of limitations. The Court rejected the notion that *Beck* mandates lesser included offense instructions in all capital cases, specifically noting: "Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process." 468 U.S. at 455, 104 S.Ct. at 3160.

■ It is well established that no lesser included offense to felony murder exists

because the *mens rea* necessary to satisfy the premeditation element of first degree murder is supplied by the specific intent required for the felony. *State v. Arias,* 131 Ariz. at 443–44, 641 P.2d at 1287–88; *see State v. Celaya,* 135 Ariz. at 255, 660 P.2d at 856. Where no lesser included offense exists, it is not error to refuse the instruction. *Spaziano v. Florida,* 468 U.S. at 455, 104 S.Ct. at 3160; *State v. Arias,* 131 Ariz. at 445, 641 P.2d at 1288.

### B.

■ Appellant also argues that the felony murder statute is unconstitutional because it denies first degree murder suspects equal protection of the laws. He notes that suspects charged under A.R.S. § 13–1105(A)(2) are denied lesser included offense instructions while those charged under A.R.S. § 13–1105(A)(1) (premeditated murder) are entitled to any lesser included offense instruction supported by the evidence. *See State v. Dalglish,* 131 Ariz. 133, 139, 639 P.2d 323, 329 (1982). Thus, appellant maintains, those charged with felony murder suffer an enhanced risk of receiving the death penalty relative to those charged with premeditated murder.[4]

Appellant fails to establish an equal protection claim. Criminal suspects are not a suspect class and we need find only a rational basis for the felony murder statute. The basis was supplied in *State v. Celaya, supra,* wherein we noted: "The felony-murder rule, designed as it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished, and is not constitutionally impermissible." 135 Ariz. at 255, 660 P.2d at 856 (quoting *State v. Goodseal,* 220 Kan. 487, 494, 553 P.2d 279, 286 (1976)).

---

**4.** Appellant also suggests that this inequity is compounded by the enormous discretion given to prosecutors in charging. The decision of whether and with what crime to charge a suspect is within the sound discretion of the prosecutor, *State v. Hankins,* 141 Ariz. 217, 221, 686 P.2d 740, 744 (1984), including whether to seek the death penalty. *State v. Gretzler,* 126 Ariz. 60, 92, 612 P.2d 1023, 1055 (1980), *appeals after*

*remand,* 128 Ariz. 583, 627 P.2d 1081 (1981), 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 32, 77 L.Ed.2d 1452 (1983). While a case of prosecutorial abuse is certainly possible, and an invidious pattern of abuse conceivable, appellant fails to make that case here.

## GRUESOME PHOTOGRAPHS

Appellant next argues that the trial court erred by admitting state's exhibits 66 and 67 over objection. Exhibit 66 depicts Mr. Hartsock's wounded neck area, and exhibit 67 depicts the same area with a steak knife alongside. The defense objected to admission of the photographs based upon their prejudicial nature and the lack of any foundation tying the pictured steak knife to the crime.

■ The touchstone of admissibility of any exhibit is relevance. Thus "[i]f the photographs have any bearing upon any issue in the case they may be received although they may also have a tendency to prejudice the jury against the person who committed the offense." *State v. Mohr,* 106 Ariz. 402, 403, 476 P.2d 857, 858 (1970). However, this does not mean that any relevant photograph may be admitted where the offered exhibit has a capacity to incite passion or inflame the jury. "[T]he court must go beyond the question of relevancy and consider whether the probative value of the exhibit outweighs the danger of prejudice by admission of the exhibit." *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). The decision to admit such exhibits rests within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *State v. Day,* 148 Ariz. 490, 497, 715 P.2d 743, 750 (1986).

■ Photographs may be admitted for many reasons, including to illustrate and explain testimony and corroborate the state's theory of how and why the crime was committed. *Id.* Here the photographs were admitted to illustrate the testimony of the state's medical expert, who testified that Hartsock's wounds were consistent with the use of two different weapons, one serrated. The photographs also corroborated Dawn Lopez' testimony that both defendants attacked Hartsock.

Appellant is correct that no foundation was laid to establish that the knife pictured in exhibit 67 was the weapon actually used. Indeed, all seemed to agree that the knife was merely an illustrative substitute. However, this fact does not doom the exhibit. "A weapon similar to that used to commit the crime may be introduced in evidence as illustrative of the weapon which the defendant used to assault his victim." *State v. Watkins,* 126 Ariz. 293, 299, 614 P.2d 835, 841 (1980) (quoting *State v. Mays,* 7 Ariz.App. 90, 92, 436 P.2d 482, 484 (1968)).

After reviewing the challenged exhibits we cannot say that the trial court abused its discretion by admitting the photographs. The photographs are not so inflammatory as to outweigh their probative value, and the ersatz weapon was sufficiently similar to the actual article to avoid tainting the exhibit. We find no error.

## WITHERSPOON ISSUE

During voir dire, Ms. Eloise Atwater expressed an aversion to capital punishment. Both appellant's counsel and state's counsel questioned Ms. Atwater on whether this aversion would affect her ability to decide the issue of guilt or innocence. Relevant portions of the colloquy between Ms. Atwater, the trial judge, and both counsel follow:

THE COURT: Mrs. Atwater, I've been trying to find out anything that might cause any of the jurors difficulty in deciding this case just on what they heard in the courtroom, not be influenced by something that they saw or heard or that happened to them once upon a time.

Will you tell us if there's anything that you can think of that I haven't already asked all you folks about that you think might cause you any trouble in being that kind of a juror? Do you think there's anything that might influence you that I haven't asked about that you think the lawyers and I ought to know in selecting this jury?

MS. ATWATER: There's one. I would not vote for capital punishment.

THE COURT: All right. Let me simply say this to you—and I did not tell the—all the jurors this—the jury will have no voice in any sentence that's given in this case. This jury will decide whether the defendants are guilty or not

guilty and that's the end of it. That's the end of the jury's function in this case.

Now, with that knowledge in mind, do you think that the possible punishment in this case, whatever it might be, would enter into your thinking as a juror?

MS. ATWATER: It might.

THE COURT: All right. I'll let the lawyers explore that if they want to. I want to move on to another subject.

* * * * * *

MR. ALFRED [State's Counsel]: Thank you, Your Honor.

Mrs. Atwater, in response to one of Judge Hannah's questions just a bit ago, you said that one of the things that might affect you in being a juror on this case was the fact that you—I think your words were you could never vote for capital punishment; is that correct?

MS. ATWATER: Right.

MR. ALFRED: You heard the Judge a while ago say that in this—that one of the charges in this case is a charge of first-degree murder?

MS. ATWATER: Yes.

MR. ALFRED: And that under Arizona law the possible punishment for that crime is either life in prison or the possibility of the death sentence also?

MS. ATWATER: Right.

MR. ALFRED: And the Judge also told you that the matter of punishment is not to be considered by the jury and that's the Judge's job to decide after the jury reaches a verdict. I take it that you are strongly opposed to capital punishment; is that correct?

MS. ATWATER: Defintely.

MR. ALFRED: Do you think that this belief that you have, this feeling, would perhaps maybe influence you a little bit as a juror?

MS. ATWATER: It could.

MR. ALFRED: What I'm saying is even—maybe even if you felt that the evidence showed that the defendants were guilty of first-degree murder, would you be maybe somewhat hesitant to vote guilty because you knew that there was a possibility of the death penalty?

MS. ATWATER: Yes.

MR. ALFRED: Okay. Thank you. That's all the questions I have.

* * * * * *

MR. BURKE [Defense Counsel]: You believe that you have a duty to serve as a juror?

MS. ATWATER: Yes.

MR. BURKE: And the Judge has already advised you, as I think the prosecutor advised you, that your function is not to deal with the question of punishment?

MS. ATWATER: Right.

MR. BURKE: You understand that?

MS. ATWATER: (No audible response)

MR. BURKE: Do you believe that you have a role as a citizen in determining questions of guilt or innocence of people who are accused of crimes?

MS. ATWATER: I hope so.

MR. BURKE: Okay. And you believe you could follow the laws that the Judge might instruct you on in deciding this case?

MS. ATWATER: I would try.

MR. BURKE: And you would try, would you not, to do your job as a citizen and evaluate the evidence fairly and honestly?

MS. ATWATER: Yes.

MR. BURKE: And make every good faith effort you could to follow the instructions of the Court?

MS. ATWATER: Yes, sir.

MR. BURKE: I have no more questions, Your Honor.

R.T., February 3, 1984, at 572–79. At the conclusion of questioning the state challenged Ms. Atwater for cause, which was granted over objection. The appellant argued then, and continues to argue now, that *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), prohibits excusing potential jurors for cause merely because they oppose the death penalty.

In *Witherspoon* the Supreme Court declared that veniremen opposed to the death penalty could be excluded from service in capital cases only if it was "made unmistakably clear ... that they would *automatically* vote against the imposition of capital punishment...." *Id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original). However, the Supreme Court has recently modified the *Witherspoon* standard. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court noted that a potential juror may be excluded for cause if the trial court believes that his attitude will "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 419, 105 S.Ct. at 850 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Moreover, *Witherspoon* applies to the sentencing phase of a trial, not to the determination of *guilt*. Only this term the Supreme Court rejected "[the] suggestion that *Witherspoon* ... [has] broad applicability outside the special context of capital sentencing ...." *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986).

Because in Arizona the judge alone determines the sentence, *Witherspoon* and its progeny would appear to have little applicability to Arizona jury selection in capital cases. However, Arizona has consistently rejected the rigid distinction between guilt determination and sentencing.

> Under the procedure used in Arizona in death penalty cases, the juror's duty is to determine guilt or innocence, while the sentence of death is solely the responsibility of the trial judge. Nevertheless, voir dire questioning related to a juror's views on capital punishment is permitted to determine whether those views would prevent or substantially impair the performance of the juror's duties to decide the case in accordance with the court's instructions and the juror's oath.

*State v. Martinez-Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985). *See also State v. Sparks*, 147 Ariz. 51, 54–55, 708 P.2d 732, 735–36 (1985); *State v. Clark*, 126 Ariz. 428, 431, 616 P.2d 888, 891, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980); *State v. Ramirez*, 116 Ariz. 259, 263–64, 569 P.2d 201, 205–06 (1977).

Ms. Atwater told the trial judge that her strong objections to capital punishment "might" enter her thinking as a juror. She told state's counsel that her beliefs "could" influence her "a little bit as a juror" and that she would be "somewhat hesitant to vote guilty" because the death penalty could be imposed. Yet, she also told defense counsel that she "would try" to evaluate evidence "fairly and honestly" and "make every good faith effort" to follow the court's instructions. Nowhere in Ms. Atwater's colloquy does she state that her views on capital punishment would "prevent or substantially impair" her ability to comply with the court's instructions and her oath as a juror. However, resolution of this issue does not hinge on the presence or absence of magical "buzz words." "Relevant *voir dire* questions addressed to this issue need not be framed exclusively in the language of the controlling appellate opinion; the opinion is, after all, an opinion and not an intricate devise in a will." *Wainwright*, 469 U.S. at 433–34, 105 S.Ct. at 857.

█ Our duty as a reviewing court is not to agree or disagree with the trial court's findings, but to determine whether those findings are fairly supported by the record considered as a whole. *Id.* At best, Ms. Atwater's comments were ambiguous and inconsistent. Mindful that the trial judge had the advantage of observing and assessing Ms. Atwater's demeanor, we believe that the trial court was entitled to resolve the ambiguity and inconsistency in favor of the state and conclude that her views on the death penalty would "prevent or substantially impair" her performance as a juror. We find no error.

## CHANGE OF VENUE

Prior to trial appellant moved for a change of venue, alleging that pretrial publicity in the Tucson area was so prejudicial to his case that he could not receive a fair

trial there. Motions were denied. The record reveals that the days following the crimes were replete with newspaper, television and radio stories covering the crimes, the victims and the LaGrands. As time passed, however, coverage waned. The most disturbing pretrial publicity came about as the result of a story on Karl LaGrand's request for a new attorney published the first morning of jury selection, which was read by several potential jurors waiting in the jury room.

 The law regarding change of venue is well established. If a defendant can demonstrate that media coverage was so extensive or outrageous that it pervaded the proceedings or created a "carnival-like" atmosphere then prejudice will be presumed without a particularized examination of the publicity's effect on the jury. *State v. Greenawalt*, 128 Ariz. 388, 391, 626 P.2d 118, 121, *cert. denied, Tison v. Arizona*, 454 U.S. 848, 102 S.Ct. 167, 70 L.Ed.2d 136 (1981); *State v. Smith*, 123 Ariz. 231, 236, 599 P.2d 187, 192 (1979).

 Absent outrageous publicity, the defendant must prove that the pretrial publicity was prejudicial and will have the likely result of depriving him of a fair trial. *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984); *State v. Greenawalt*, 128 Ariz. at 391, 626 P.2d at 121; 17 A.R.S. Rules of Crim.Pro., Rule 10.3(b). Appellant failed to demonstrate presumptively prejudicial pretrial publicity, and was therefore charged with the burden of demonstrating actual jury prejudice. *State v. Greenawalt*, 128 Ariz. at 391, 626 P.2d at 121; *State v. Schmid*, 109 Ariz. 349, 353, 509 P.2d 619, 623 (1973). The trial court's decision on this issue will be accorded deference. *See State v. Chaney*, 141 Ariz. at 302, 686 P.2d at 1272.

 Our review of the record and particularly of voir dire confirms the trial court's decision. While some jurors had gleaned prior knowledge of the case from the media, others knew nothing of it. However, prior knowledge of a case has never been held to be automatic grounds for disqualification. *Id.; State v. Smith*, 123 Ariz. at 236, 599 P.2d at 192. It is the *effect* of publicity on a juror's objectivity that is critical, not the extent of publicity. *State v. Chaney*, 141 Ariz. at 302, 686 P.2d at 1272; *State v. Greenawalt*, 128 Ariz. at 392, 626 P.2d at 122. The trial took place two years after the crimes, the voir dire was conducted individually as well as in a group, and questioning was quite extensive. The effect of pretrial publicity was well developed by defense counsel and several potential jurors were excused for cause for that reason. Those jurors remaining on the jury either knew nothing of the case or satisfied the judge that they could lay aside any preconceived notion and render a verdict based only on evidence. We find no error.

## DEATH PENALTY

 Finally, appellant challenges imposition of the death penalty. In every death penalty case we are obligated to independently review the record to determine for ourselves whether aggravating circumstances have been proven beyond a reasonable doubt and all appropriate mitigation considered. *State v. Rossi*, 146 Ariz. 359, 365, 706 P.2d 371, 377 (1985); *State v. Hensley*, 142 Ariz. 598, 603, 691 P.2d 689, 694 (1984); *State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57, 67, *cert. denied*, 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983). Our review necessarily includes the propriety of the death penalty in any given case. *State v. Hensley*, 142 Ariz. at 603, 691 P.2d at 694.

The trial court found that three aggravating circumstances were proven beyond a reasonable doubt: prior conviction of a felony involving the use or threat of violence on another person, A.R.S. § 13–703(F)(2); expectation of the receipt of something of pecuniary value, A.R.S. § 13–703(F)(5); and commission of the crime "in an especially heinous, cruel or depraved manner," A.R.S. § 13–703(F)(6). The trial judge found three mitigating factors: defendants' ages (Walter was 19 and Karl was 18 at the time of the killing), their prior home lives, and their remorse. The trial judge did not find these mitigating factors sufficient to outweigh

the three aggravating circumstances and imposed the death penalty.

### A. Prior Conviction

▉ Appellant does not offer any specific evidence to rebut the finding of a prior conviction, but suggests that it was not proven beyond a reasonable doubt. We disagree. A hearing was held at which the state amply demonstrated prior convictions for armed robbery and kidnapping. These felonies involved the use or threat of violence and fulfill requirements of A.R.S. § 13–703(F)(2).

### B. Pecuniary Gain

We have stated that "to prove pecuniary gain, the state must show the actor's *motivation* was the expectation of pecuniary gain...." *State v. Carriger,* 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), *cert. denied,* 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985). "Pecuniary consideration must be a cause of the murder, not merely a result." *State v. Libberton,* 141 Ariz. 132, 139, 685 P.2d 1284, 1291 (1984). Thus, "an unexpected or accidental death that was *not in furtherance of the defendant's goal of pecuniary gain, which occurs during the course of or flight from a robbery,* does not in itself provide a sufficient basis for finding the aggravating circumstance." *State v. Hensley,* 142 Ariz. 598, 603–04, 691 P.2d 689, 694–95 (emphasis added) (quoting *State v. Harding,* 137 Ariz. 278, 296–97, 670 P.2d 383, 394–95 (1983), *later appeal,* 141 Ariz. 492, 687 P.2d 1247, *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984). *Accord State v. Nash,* 143 Ariz. 392, 405, 694 P.2d 222, 235, *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). Evidence of pecuniary gain must be shown beyond a reasonable doubt. *State v. Jordan,* 126 Ariz. 283, 286, 614 P.2d 825, 828, *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980).

In making this determination, we should not, however, ignore the reason for defendant's presence at the scene of the crime. When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant.

The following cases are helpful in demonstrating the expectation of pecuniary gain:

*State v. Smith,* 146 Ariz. 491, 501–03, 707 P.2d 289, 299–301 (1985) ("defendant committed the murder solely for the purpose of gaining access to the cash register, which was under the victim's control"; "the commission of the killing necessarily carried with it the expectation of pecuniary gain").

*State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986) (defendant robbed home of victims, then took victims to desert where he shot and killed them; held that defendant "very carefully executed the armed robbery and the murders were part of the scheme of the robbery").

*State v. Hensley,* 142 Ariz. 598, 604, 691 P.2d 689, 694 (1984) (during robbery of bar, defendant forced victims to lie on floor and, in order that no witnesses be left to identify the robbers, defendant shot each execution style; "the murders were a part of the overall scheme of the robbery with the specific purpose to facilitate the robbers escape").

*State v. Harding,* 141 Ariz. 492, 500, 687 P.2d 1247, 1255 (1984) (robbery victim who was bound and gagged by defendant died of asphyxiation; "the purpose for binding and gagging ... was to facilitate the robbery and hinder detection"), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984).

*State v. Harding,* 137 Ariz. 278, 294, 670 P.2d 383, 399 (1983) (defendant robbed, bound and gagged victims who he shot; murders committed "in the course of obtaining valuable personal property from ... victims").

*Contra see State v. Gillies,* 135 Ariz. 500, 512, 662 P.2d 1007, 1018–19 (1983) (defendant confessed that purpose of murdering rape victim was to eliminate her, not to steal her credit cards and cash; therefore, "Without some tangible evidence, it is not for the sentencing court to conclude that because money and items were taken, the purpose of the murder was pecuniary gain."), *later ap-*

*peal,* 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).

We do not believe the defendant must intend beforehand to kill as well as to rob to satisfy the statute. A.R.S. § 13–703(F)(5). Nor do we believe that an absence of actual receipt of money or valuables negates a finding of expectation of pecuniary gain as an aggravating circumstance.

In this case, the attempted robbery permeated the entire conduct of the defendant. The defendant may have reacted irrationally to the failure or inability of the victim to open the safe but the murder was neither accidental nor unexpected. The reason defendant was there was his expectation of pecuniary gain and the reason he stabbed the victim was because the victim was unable to open the safe, frustrating defendant's continuing attempt for pecuniary gain. The defendant's goal of pecuniary gain caused the murder and the murder was in furtherance of his goal. We agree with the trial court's finding that the defendant's expectation of pecuniary gain was an aggravating factor.[5]

### C. Cruel, Heinous or Depraved

Appellant challenges the trial court's finding that Hartsock's murder was committed in an especially cruel, heinous or depraved manner under A.R.S. § 13–703(F)(6). We consider the elements separately, as the statute is disjunctively phrased.

"Cruelty has been defined as the pain and distress suffered by a victim before

death. To support a finding of cruelty, evidence of the suffering or pain experienced by the victim must be apparent." *State v. Wallace,* 151 Ariz. 362, 367, 728 P.2d 232, 237 (1986) (citations omitted). The requisite pain and distress can be either physical or mental. *State v. Gretzler,* 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983).

Evidence abounds in this case indicating that Hartsock suffered mental and physical anguish. He was bound and gagged, called a liar, and threatened with death more than once. He had a letter opener placed against his throat. He received twenty-four stab wounds of which only five would have immediately killed him. Thus we can reasonably assume that the victim did not die instantly but rather suffered some physical torment prior to dying. We do not hesitate to conclude that Hartsock's murder was committed in an especially cruel manner.

"[S]tatutory concepts of heinous and depraved involve a killer's vile state of mind at the time of the murder, as evidenced by the killer's actions." *State v. Gretzler,* 135 Ariz. at 51, 659 P.2d at 10. Specific factors leading to a finding of heinousness or depravity include the apparent relishing of the murder by the killer, infliction of gratuitous violence on the victim, needless mutilation of the victim, senselessness of the crime, and helplessness of the victim. *Id.* at 52, 659 P.2d at 11.

The second, third, and fifth factors are present here.[6] To stab a bound and gagged man two dozen times clearly constitutes gratuitous violence on and needless

---

5. I respectfully dissent from this section of the opinion, which expresses the view of the majority of the Court. I agree with the majority's statement of the law, as it reiterates my belief that pecuniary gain must be the cause of the murder and that the murder must be in furtherance of the goal of pecuniary gain. *See State v. Harding,* 137 Ariz. 278, 296–97, 670 P.2d 383, 401–02 (1983) (Gordon, V.C.J., specially concurring). However, I disagree that pecuniary desires necessarily caused Hartsock's murder merely because the LaGrands intended to rob the bank. Nor do I agree that Hartsock's murder furthered any pecuniary desires. Hartsock's death provided the LaGrands with neither access to nor escape with money or other valuables. Finally, I not believe that evidence

proves beyond a reasonable doubt that pecuniary desires motivated Hartsock's murder. My review of the record suggests that it is equally, if not more, likely that the panic caused by Hartsock's kick to Karl's leg, rather than pecuniary desires, motivated the LaGrands to kill Hartsock.

Because I would strike one of the trial judge's aggravating circumstances and mitigating circumstances exist, I would remand for resentencing. *See State v. Wallace,* 151 Ariz. 362, 728 P.2d 232 (1986); *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983).

6. Not all five factors need be present. "The mere existence of senselessness or helplessness of the victim, in isolation, need not always lead

mutilation of a helpless victim. Only a heinous and depraved state of mind would cause one person to treat another person with such callous disregard for human worth. The trial court did not err in concluding that Hartsock was killed in a heinous or depraved manner.

■ The trial court found no mitigating circumstances sufficient to outweigh aggravating circumstances. The trial judge considered defendants' ages (Walter was 19 and Karl was 18 at the time of the killing), their prior home lives, and their remorse. We are obligated to consider "any relevant mitigating evidence." *Skipper v. South Carolina*, 476 U.S. 1, ——, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1 (1986) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 876–77, 71 L.Ed.2d 1 (1982)). In addition to noting defendants' relatively young ages,[7] we have reviewed histories of their upbringing, transcripts of oral and written statements of remorse, and evidence that defendants may have killed Hartsock out of fear and surprise rather than as part of a calculated scheme. Given the especially cruel, heinous, and depraved nature of defendants' conduct, however, we conclude that these mitigating factors do not outweigh the existing aggravating circumstances and thus do not warrant leniency.

### D. Proportionality Review

■ Our purpose in conducting a proportionality review is to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232 (1986) (quoting *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1983)). We have considered cases involving multiple aggravating circumstances and no mitigating circumstances justifying leniency; *see, e.g., State v. Martinez-Villareal*, 145 Ariz. 441, 702 P.2d 670 (1985); *State v. Gretzler*, 135 Ariz. 42,

659 P.2d 1 (1983); *State v. Vickers*, 129 Ariz. 506, 633 P.2d 315 (1981); *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980); cases where mitigating circumstances included an unpleasant childhood, *see, e.g., State v. Gretzler, supra; State v. Clark, supra;* and cases where mitigating circumstances included the defendant's age, *see, e.g., State v. Valencia*, 132 Ariz. 248, 645 P.2d 239 (1982); *State v. Vickers, supra; State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981); *State v. Clark, supra.* Based on our review of these decisions, we conclude imposition of the death penalty in this case is proportional to sentences imposed in similar cases.

### E. *Enmund* Claim

■ Defendant challenges imposition of the death penalty on grounds that the trial court failed to make a finding in conformity with *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Enmund*, the Supreme Court ruled that the Eighth Amendment forbids imposition of the death penalty on one "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. An *Enmund* determination can be made by a jury, trial judge or appellate court. *Cabana v. Bullock*, 474 U.S. 376, 386–387, 106 S.Ct. 689, 697, 88 L.Ed.2d 704 (1986). The trial judge satisfied *Enmund* when he concluded "beyond a reasonable doubt that both defendants participated in the actual killing of Mr. Hartsock and that both defendants intended to kill him." R.T., December 14, 1984, at 14.

### CONCLUSION

Appellant's convictions and sentences are affirmed.

HAYS, J. (Retired), CAMERON and HOLOHAN, JJ., concur.

---

to a holding that the crime is heinous or depraved, however." *State v. Gretzler*, 135 Ariz. at 52–53, 659 P.2d at 11–12.

**7.** A.R.S. § 13–703(G)(5) specifically lists the defendant's age as a mitigating factor. *See also Eddings v. Oklahoma*, 455 U.S. 104, 116, 102

S.Ct. 869, 877, 71 L.Ed.2d 1 (1982) (minor's age is a "relevant mitigating factor of great weight"); *State v. Valencia*, 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982) (age "is a substantial and relevant factor which must be given great weight").

38

FELDMAN, Justice, concurring

I concur in the decision and in the court's analysis, except that portion pertaining to the aggravating circumstance involving pecuniary gain. 153 Ariz. at 36, 734 P.2d at 578. With respect to that portion of the opinion, I join in the views expressed by Chief Justice Gordon in footnote 5, at 36, 734 P.2d at 578.