NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ISMAEL LEON, *Appellant*.

No. 1 CA-CR 14-0128
FILED 3-10-2016

Appeal from the Superior Court in Maricopa County
No.  CR2013-002558-001-DT
The Honorable Sherry K. Stephens, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Myles A. Braccio
*Counsel for Appellee*

The Hopkins Law Office, P.C., Tucson
By Cedric M. Hopkins
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Chief Judge Michael J. Brown delivered the decision of the Court, in which Acting Presiding Judge John C. Gemmill and Judge Margaret H. Downie joined.

---

**B R O W N**, Chief Judge:

¶1         Ismael Leon appeals his convictions and sentences for first-degree felony murder, drive-by shooting, and assault.  For the reasons that follow, we affirm.

## BACKGROUND

¶2         On the evening of February 11, 2012, Leon and his cousin, Jaime Martinez, attended a party with friends at an apartment in Buckeye. Around 1:00 a.m., M.B. and the victim (M.B.'s boyfriend), guests from the neighboring apartment, knocked on the door where the party was being held and asked the occupants to turn down the music so their children could sleep. The occupants refused, yelling and cursing at M.B., so she called the police.

¶3         At that point, the victim turned to pick up a child, but Leon and Martinez, who had joined the group in front of the apartment, immediately knocked the victim to the ground, beating and kicking him. Eventually the victim was able to stumble away from the apartment, while Leon and Martinez ran toward the parking lot.  Seeing his attackers fleeing, the victim "ran to his truck" and parked behind Leon's vehicle to block it in.  The victim approached Leon's vehicle and was shot in the chest.  He stumbled for a short distance, but then fell to the ground.  As the driver, Leon maneuvered his vehicle around the victim's truck and fled the parking lot.  The victim died shortly after police and emergency responders arrived at the scene. No weapons were found on the victim's body or elsewhere in the parking lot.

¶4         An officer responding to the emergency call spotted a vehicle on a nearby residential street.  The officer activated her patrol vehicle's lights and parked in front of the car.  When the officer approached, Leon was the only person in the car.  The officer observed blood running down

the rear driver's side window "like water."  The officer then placed Leon under arrest.

¶5        Subsequent to Leon's arrest, detectives searched the area surrounding Leon's vehicle and found a "pistol grip" shotgun laying in front of a chain link fence at a residence.  Detectives executed a search warrant on Leon's vehicle and impounded three spent shell casings, which matched the firing pin impressions of the shotgun.  Leon's palm print was also found on the shotgun.  Based on forensic evidence obtained from Leon's vehicle and the blood spatter on his clothing, police concluded Leon, not Martinez, shot the victim.  The State subsequently charged Leon with one count of first-degree felony murder, one count of drive-by shooting, and one count of aggravated assault.  Martinez[1] was charged with one count of aggravated assault and one count of hindering prosecution in the first degree.

¶6        At trial, Leon testified that the victim "swung" at him during the initial altercation and he therefore acted in self-defense when he and Martinez struck the victim ten to fifteen times.  Leon further testified that the victim ran into the neighboring apartment and returned with a "knife or a gun," so he and Martinez ran.  In response to questioning, however, Leon admitted that he did not actually see a weapon and it "could have been anything."  Leon also testified that after he and Martinez got into his car, Martinez pushed him out of the way and shot the victim.  Leon then drove several blocks and Martinez told him to stop the car.  Martinez then fled with the gun before Leon was placed under arrest.  Leon admitted he owned the gun used to kill the victim and that he kept the gun loaded in his backseat.  Leon also acknowledged he initially told police officers that he alone fought the victim and an unidentified Hispanic man shot the victim.  Leon did not claim Martinez was the shooter until January 2013, eleven months after the shooting.

¶7        After a nineteen-day trial, a jury found Leon guilty of first-degree felony murder, drive-by shooting, and the lesser-included offense of assault.  The trial court sentenced Leon to natural life for the murder conviction, a concurrent, presumptive prison term of 10.5 years for drive-by shooting, and a jail term of six months for assault.  Leon timely appealed.

---

[1]        Martinez was not in the vehicle when Leon was arrested; however, he self-surrendered the next day with the assistance of counsel.

## DISCUSSION

### I. Witness Invocation of the Fifth Amendment

¶8 Leon argues the trial court erred by permitting Carmen Martinez (Martinez' mother) and Adela (Leon) Dennett (Leon and Martinez' aunt) to invoke their Fifth Amendment privilege against self-incrimination and refuse to testify. Specifically, Leon contends the court failed to follow the requisite procedures to ascertain whether the witnesses were entitled to a blanket invocation of the privilege.

¶9 In June 2013, Leon filed a supplemental notice of defense witnesses in which he identified several potential witnesses, including Carmen and Adela, and stated "there is potential that Adela Leon . . . and Carmen Martinez could incriminate themselves as to hindering prosecution, and tampering/destruction of evidence, and [Leon] therefore requests this court to appoint counsel to those individuals[.]"[2] Consistent with Leon's request, the court appointed counsel to represent Carmen and Adela.

¶10 Leon then requested a hearing regarding the validity and scope of the prospective witnesses' invocation of the Fifth Amendment. In his motion, Leon argued the scope of the witnesses' Fifth Amendment privilege should be limited and they, as witnesses to Martinez' "appearance, demeanor, and actions on the night of the shooting and shortly thereafter," should be compelled to testify regarding those observations. Leon acknowledged that "these witnesses committed crimes of concealment and destruction of evidence that would be covered by the Fifth Amendment," but argued "their eyewitness observations are not covered by that invocation."

¶11 On July 8, 2013, the trial court held a pretrial hearing to discuss, among other matters, Carmen and Adela's invocation of the Fifth Amendment. Defense counsel explained she anticipated the court would hold a hearing at which the invoking witnesses "would take the stand," be subjected to examination, and the court would determine "whether all the [proffered] questions would, indeed, be covered under the scope" of the Fifth Amendment. At that point, Carmen's appointed counsel informed the

---

[2] Leon also noticed Jessica Leon, Martinez' sister, as a prospective witness, based on her exposure to criminal liability for hindering prosecution and destroying evidence. Jessica did not, however, assert the privilege against self-incrimination.

court that defense counsel had emailed "the questions that were going to be asked" and the "main" questions were: "What did you do with the gun? How did you help [Martinez] in terms of, you know, getting out of?"  Based on the nature of the submitted questions, Carmen's attorney explained that he did not bring his client to the hearing because, "without fail, we're going to assert the Fifth."  The court instructed counsel to bring Carmen to a hearing scheduled for August 6, 2013 so they could question her "on the record."

¶12        At the outset of the August 6 hearing, defense counsel again stated her "understanding" that she would be allowed to question Carmen and Adela and the court would then determine whether the witnesses could invoke the Fifth Amendment on a "question by question basis." Defense counsel noted that Carmen and Adela "probably are exposed to some sort of criminal liability, however, those weren't the crux of the issues that I wanted to ask them about.  I wanted to ask them about their observations and admissions which would be non-hearsay by [Martinez] to them."  Defense counsel suggested that the exposure to liability problem could be resolved if the State offered Carmen and Adela immunity, but the prosecutor responded that she had "no intention of offering anyone any immunity[.]"  The prosecutor further stated her belief that, if Carmen and Adela were questioned regarding whether they saw Martinez that night and whether he made any admissions to them," it's my position that [they] could tend to incriminate themselves if they helped him avoid capture by taking him to a hotel . . . and if they destroyed [his] clothing," as alleged by defense counsel.  The prosecutor opined that "even just testifying about observations could incriminate them . . . [s]o I think they have a valid Fifth Amendment right to all questions posed by [defense counsel] in this case." The court then found "there is a [Fifth Amendment] privilege with respect to these two witnesses."

¶13        "We review a trial court's decision to excuse a witness asserting the privilege against self-incrimination for an abuse of discretion." *State v. Rosas-Hernandez*, 202 Ariz. 212, 216, ¶ 10 (App. 2002).  Although a criminal defendant has a right to compulsory process to obtain material and favorable testimony, this right is "not absolute" and a trial court must "balance the defendant's Sixth Amendment right to compulsory process against a witness's Fifth Amendment right to avoid self-incrimination." *State v. Maldonado*, 181 Ariz. 208, 210 (App. 1994).   Under this balancing test, a "valid assertion of [a] witness' Fifth Amendment rights justifies a refusal to testify despite the defendant's Sixth Amendment rights."  *Id.* (internal quotation omitted); *Rosas-Hernandez*, 202 Ariz. at 216, ¶ 10 (explaining that a "defendant's right to compulsory process must yield" to

a witness' proper invocation of the privilege not to incriminate himself). When the trial court "determines that a witness could legitimately refuse to answer essentially all relevant questions, then that witness may be totally excused without violating an individual's Sixth Amendment right to compulsory process." *State v. Harrod*, 218 Ariz. 268, 276, ¶ 20 (2008) (internal quotations omitted).

¶14        The determinative issue here, therefore, is whether the witnesses had a valid Fifth Amendment right to assert. *Rosas-Hernandez*, 202 Ariz. at 216, ¶ 10. "To validly invoke Fifth Amendment rights, a witness must demonstrate a reasonable ground to apprehend danger from being compelled to testify." *Id*. at ¶ 11. The trial court may evaluate the validity of a witness' Fifth Amendment invocation by conducting an in camera hearing. *State v. Mills*, 196 Ariz. 269, 276, ¶ 31 (App. 1999). However, the court need not "personally question the witness, conduct a hearing, or allow counsel to call the witness to the stand if the court possesses extensive knowledge of the case such that it can find that the witness can legitimately invoke the Fifth Amendment to all relevant questions asked." *Harrod*, 218 Ariz. at 276, ¶ 21 (internal quotation omitted).

¶15        Applying these principles here, both the prosecutor and defense counsel acknowledged that Carmen and Adela would be exposed to criminal liability if they testified regarding their actions following the shooting. Although defense counsel asserted she could question the witnesses regarding their *observations* of Martinez without infringing on their right against self-incrimination, the prosecutor opined that Carmen and Adela would be exposed to criminal liability if they testified regarding their involvement in any of the events that occurred that evening. Defense counsel submitted questions to the witnesses' counsel in advance of the hearing, but these email communications are not in the record. Instead, the only questions included in the record are those read by appointed counsel at the July 8, 2013 hearing, both of which clearly implicate the Fifth Amendment. Defense counsel made no proffer of other questions that would not trigger the witnesses' privilege against self-incrimination or otherwise explain how she would question the witnesses regarding what they observed while committing crimes, without exposing them to criminal liability for the underlying crimes. Because the witnesses' possible observations following the shooting cannot be bifurcated from their alleged criminal activities that evening, the trial court did not abuse its discretion

by finding the Fifth Amendment right against self-incrimination precluded defense counsel from calling Carmen and Adela to testify.[3]

## II.     Lack of Immunity

**¶16**        Leon argues the trial court erred by failing to sua sponte grant Carmen and Adela immunity so they could testify at trial without being exposed to criminal liability.  Citing *State v. Axley*, 132 Ariz. 383 (1982), Leon contends that a trial court must grant immunity when a prospective witness will present "clearly exculpatory evidence" and the failure to do so will prevent the defendant from presenting "a complete defense."

**¶17**        As noted by the State, Leon did not raise this claim in the trial court, and we therefore review the claim only for fundamental error.  *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005).  As our supreme court stated in *Axley*, it is generally "a matter of prosecutorial discretion to decide when the public interest would be best served by a grant of immunity."  132 Ariz. at 388.  Nonetheless, a court may require the government to extend immunity if "prosecutorial misconduct caused the witness to withhold testimony" or the testimony is "clearly exculpatory and essential to [the defendant's] case."  *Id*. at 388.  Absent these limited exceptions, the Sixth Amendment does not require "either the prosecutor or the court . . . to secure testimony from a defense witness by replacing the protection of the self-incrimination privilege with a grant of use immunity."  *Id*. at 389 (internal quotation omitted).

**¶18**        With respect to the first exception, Leon has not asserted any claim of prosecutorial misconduct.  As to the second exception, Leon provided no offer of proof demonstrating Carmen and Adela would provide clearly exculpatory evidence.  Instead, Leon expressed an intent to elicit testimony regarding Martinez' demeanor, appearance, and conduct the night of the shooting.  Assuming the witnesses would testify that Martinez' appearance and demeanor were consistent with having been involved in a shooting, this evidence would possibly serve to inculpate

---

[3]        We also reject Leon's additional claim that the trial court erred by excusing Adela from testifying because, unlike Carmen's appointed counsel, Adela's attorney did not specifically inform the court his client would invoke the Fifth Amendment in response to each of defense counsel's submitted questions.  The record reflects that both the prosecutor and defense counsel regarded the witnesses as similarly situated with respect to their alleged criminal activity and Fifth Amendment protections, and there is no basis on this record for distinguishing between them.

Martinez, but would not clearly exculpate Leon, given the State's evidence relating to the likely connection between Leon, as the shooter, and the significant blood spatter on his body and clothing at the time of his arrest. Moreover, defense counsel asserted Martinez *may have* told Carmen and Adela that he, not Leon, was the shooter. Mere speculation that a prospective witness may provide exculpatory evidence does not mandate court-ordered immunity. Therefore, because the testimony of the prospective witnesses was not clearly exculpatory, we find no error, much less fundamental error, in the trial court not sua sponte granting Carmen and Adela immunity.

### III. Exclusion of Witness Testimony Based on a Lack of Trustworthiness

¶19 Leon argues the trial court erred by excluding the testimony of his sister, Victoria Leon. Specifically, he contends Victoria should have been permitted to testify regarding self-inculpatory statements Martinez allegedly made to her under the hearsay exception outlined in Arizona Rule of Evidence ("Rule") 804(b).

¶20 Before trial, the State filed a motion in limine to preclude Victoria from testifying that Martinez made certain statements to her the night of the shooting. Applying Rule 804(b)'s three-part test, the State conceded that the declarant was unavailable to testify (Martinez having asserted his Fifth Amendment privilege against self-incrimination) and that the alleged statement was against the declarant's interest (exposing Martinez to criminal liability). With respect to the third prong of the test, however, the State asserted the statement lacked trustworthiness and was therefore inadmissible.

¶21 At an evidentiary hearing held on September 11, 2013, Victoria testified that she was asleep when she received a telephone call from Jessica Leon (her cousin and Martinez' sister) between 12:00 a.m. and 2:00 a.m. on February 12, 2012. Jessica asked Victoria if she knew where Leon was and Victoria stated she did not know. Jessica then explained that Leon and Martinez had been involved in a fight and Martinez "had shot somebody." Jessica told Victoria that she and Martinez were at their dad's apartment in West Phoenix. At that point, Jessica handed the phone to Martinez and he told Victoria that he and Leon "got in a fight" and "some guy was running after them . . .with a gun" and was going to shoot Leon so Martinez "reacted and had to shoot the guy." Victoria asked Martinez whether he actually shot the man or just shot at him and Martinez replied "I shot him. That fool dropped." Martinez then told Victoria that he got

rid of the gun, ran "as far as [he] could," lost one shoe, and then "somebody gave [him] a ride." When asked whether she could substantiate the phone call through phone records, Victoria testified that she contacted her service provider and was informed phone records are only maintained for six months and therefore no record was available. Victoria acknowledged she had not informed the State about her phone call with Martinez until seven months after the shooting, but claimed she told Leon's initial attorney, Michael Leal, about the conversation shortly after he was retained.

¶22        At a subsequent evidentiary hearing held mid-trial, Leal testified he had no recollection of Victoria mentioning the phone call with Martinez. Indeed, Leal testified that no one told him Martinez had confessed to the shooting. An investigator for the defense testified he did not learn of Martinez' alleged confession to Victoria until September 28, 2012. In an attempt to corroborate Victoria's description of events, he listened to Martinez' jail phone calls with Carmen. In those phone calls, Martinez told Carmen he lost a shoe the night of the shooting while running from the police and that the shooting was in self-defense.

¶23        After hearing oral argument on the motion, the trial court found Martinez was unavailable and the alleged hearsay constituted a statement against interest for purposes of Rule 804(b), but further found Leon had not met his burden of proving the hearsay statements were "clearly trustworthy." In making this ruling, the court noted: (1) Jessica denied the conversation between Martinez and Victoria occurred; (2) Leal had no recollection of Victoria reporting the alleged confession; (3) in her written statement, Victoria stated Martinez stood outside the vehicle when he shot the victim, contrary to all forensic evidence and eyewitness testimony; (4) Victoria did not disclose the alleged confession to any attorney (other than Leal, allegedly) or law enforcement personnel until many months after it allegedly occurred; (5) according to Victoria, Martinez stated the victim "dropped," which was inconsistent with forensic evidence and eyewitness testimony that he walked several feet before collapsing; and (6) contrary to Martinez' alleged statement, there is no evidence the victim had a gun or other weapon. Finding that the corroborating circumstances failed to clearly indicate trustworthiness, the court precluded Victoria from testifying as to Martinez' alleged confession.

¶24        We review a trial court's decision whether to allow witness testimony for an abuse of discretion. *State v. Carlos*, 199 Ariz. 273, 277, ¶ 10 (App. 2001). In general, out-of-court statements offered to prove the truth of the matter asserted are inadmissible unless rooted in a hearsay exception. Ariz. R. Evid. 801(c); 802. One recognized exception is for statements

against interest, permitting the introduction of an out-of-court statement when the declarant is unavailable, the nature of the statement is against the declarant's interest, and the veracity of the statement is "supported by corroborating circumstances that clearly indicate its trustworthiness[.]" Rule 804(b)(3).

¶25        "A declarant is considered unavailable if he asserts his privilege against self-incrimination." *State v. LaGrand*, 153 Ariz. 21, 27 (1987). The State concedes that Martinez has invoked his Fifth Amendment right and is unavailable to testify. Contrary to its position before the trial court, however, the State now contends Martinez' statement that he shot the victim in self-defense is not a statement against interest because, rather than exposing Martinez to criminal liability, the statement presented a defense to criminal liability.

¶26        To qualify as a statement against interest, a statement must be one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability." Ariz. R. Evid. 804(b)(3)(A). "Courts must analyze each proffered statement separately to determine whether it is truly against penal interest," and only self-inculpatory statements are admissible under Rule 804(b)(3). *State v. Nieto*, 186 Ariz. 449, 455 (App. 1996). Therefore, when a statement is partially self-inculpatory and partially self-exculpatory, only the self-inculpatory portions of the statement are admissible under the Rule 804(b)(3) hearsay exception. *Id.*

¶27        Here, Martinez' alleged statement that he shot the victim is self-inculpatory because it would expose him to criminal and civil liability. The portion of his statement justifying the shooting as an act of self-defense is not self-inculpatory and therefore is not admissible under Rule 804(b)(3). Because the portion of the statement that Leon primarily sought to present to the jury was self-inculpatory, we must consider whether the statement is sufficiently trustworthy to qualify for the hearsay exception.

¶28        "To determine whether guarantees of trustworthiness exist, courts must consider the totality of circumstances . . . that surround the making of the statement and that render the declarant particularly worthy of belief." *Nieto*, 186 Ariz. at 454 (internal quotation omitted). Our supreme court has identified several factors to consider in determining whether a statement demonstrates sufficient trustworthiness: (1) the existence of corroborating and contradictory evidence; (2) the relationship between the declarant and the listener; (3) the relationship between the declarant and

the defendant; (4) the number of times the statement is made; (5) the amount of time that has passed between the event at issue and when the statements are made; (6) whether the declarant will benefit from the statement; and (7) the psychological and physical environment surrounding the making of the statement. *LaGrand*, 153 Ariz. at 27-28. Because credibility questions "traditionally fall within the province of the jury rather than the judge," the supreme court explained that the court's role "should be limited to asking whether evidence in the record corroborating and contradicting the declarant's statement would permit a reasonable person to believe that the statement could be true." *Id.* In the event the court determines a reasonable person could conclude "from corroborating and contradictory evidence in the record that the declarant's statement could be true," the court "must admit the statement into evidence," and allow the jury to consider the other factors and assess credibility. *Id.*

**¶29**         Analyzing the corroborating and conflicting evidence, Martinez' jail telephone call to Carmen supports Victoria's testimony because Martinez stated he lost one of his shoes the night of the shooting and also claimed the shooting was an act of self-defense.[4] The contradictory evidence, on the other hand, includes Jessica's testimony that Martinez was not with her the night of the shooting and the alleged phone call between Victoria and Martinez at her father's apartment never occurred, Leal's testimony that he did not recall Victoria informing him of the alleged confession, and the forensic evidence and eyewitness testimony contradicting Victoria's written statement that Martinez told her he was outside Leon's vehicle when he shot the victim. On balance, the corroborating and conflicting evidence would not permit a reasonable person to believe the alleged statements are true and therefore the trial court acted within its discretion in excluding Martinez' alleged statement.

---

[4]      Leon's statements identifying Martinez as the shooter also arguably corroborate Victoria's testimony. The weight accorded these self-serving statements is minimal, however, given Leon's claim for nearly a year after the shooting that the shooter was an unidentified Hispanic man.

**CONCLUSION**

¶30  For the foregoing reasons, we affirm Leon's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
FILED: ama